PATTERSON BELKNAP WEBB & TYLER LLP
Philip R. Forlenza (*prforlenza@pbwt.com*)
Peter W. Tomlinson (*pwtomlinson@pbwt.com*)
Henry J. Ricardo (*hjricardo@pbwt.com*)
Benjamin S. Litman (*blitman@pbwt.com*)
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222

*Attorneys for Ambac Assurance Corporation and*
*The Segregated Account of Ambac Assurance Corporation*

12 CIV 7937

RECEIVED
OCT 24 2012
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMBAC ASSURANCE CORPORATION and
THE SEGREGATED ACCOUNT OF AMBAC
ASSURANCE CORPORATION,

                  Plaintiffs,

            - against -

CAPITAL ONE, N.A., as successor by merger to
CHEVY CHASE BANK, F.S.B.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 12 Civ. ____

**COMPLAINT**

      Plaintiffs Ambac Assurance Corporation ("Ambac") and the Segregated Account

of Ambac Assurance Corporation (the "Segregated Account" and, collectively with Ambac,

"Plaintiffs"), by their attorneys, Patterson Belknap Webb & Tyler LLP, for their complaint

against defendant Capital One, N.A. ("Capital One"), as successor by merger to Chevy Chase

Bank, F.S.B. ("Chevy Chase"), hereby allege as follows:

## NATURE OF ACTION

      1.    Plaintiffs bring this action to seek redress for Capital One's egregious

mortgage-loan underwriting practices, as revealed through its pervasive breaches of the parties'

agreements pertaining to six residential-mortgage-backed securitization transactions that Capital

One sponsored and persuaded Ambac to insure:  Chevy Chase Funding LLC Mortgage-Backed

Certificates, Series 2006-1, 2006-2, 2006-3, 2006-4, 2007-1, and 2007-2 (collectively the

"Transactions," and each individually a "Transaction").[1]  With respect to each Transaction,

Ambac issued an insurance policy (each a "Policy," and collectively the "Policies") that

guaranteed certain payments due on certain of the securities issued in the Transaction in case the

underlying loans did not provide sufficient payments of principal and interest.

2.      Capital One persuaded Ambac to participate in the Transactions and to

issue its Policies by making numerous untrue representations and warranties, and providing

numerous remedies for breaches of those representations and warranties, in the agreements

effectuating the Transactions.  Capital One's representations and warranties took two forms:

loan-level representations and warranties (the "Loan-Level Warranties"), which were made to

several parties in Pooling and Servicing Agreements to which Ambac was a third-party

beneficiary, and transaction-level representations and warranties (the "Transaction-Level

Warranties"), which were made only to Ambac, in Insurance and Indemnity Agreements (the

"I&I Agreements") with Ambac.

3.      The Loan-Level Warranties guaranteed the accuracy of the information

given to Ambac concerning the quality of each of the individual loans that Capital One included

in the Transactions as collateral for the issued securities.  These representations and warranties

included assurances that each of the loans had been properly underwritten and was not infected

by fraud on the part of any person, that the borrowers were not in breach of their obligations, and

---

[1]      Because Chevy Chase no longer exists following its merger with and into Capital One, N.A., this Complaint refers to Capital One when it means Chevy Chase, unless quoted text refers to Chevy Chase or the context requires a reference to Chevy Chase.

that the disclosures made about the attributes of each individual loan were true, accurate, and complete. Whereas Capital One assumed the risk that the Loan-Level Warranties were false, Ambac assumed the risk that the loans *bearing the attributes that Capital One represented and warranted* might not perform as expected after the closing of the Transactions. Capital One provided further comfort to Ambac by committing, as an expedited remedy, to cure discovered breaches of Capital One's Loan-Level Warranties or to repurchase the affected loans.

4.     The Transaction-Level Warranties guaranteed the accuracy of all of the information provided by Capital One to Ambac about, among other things, Capital One's mortgage-lending and underwriting practices, as well as its general business practices and financial condition, and the aggregate attributes of the pools of mortgage loans securitized in the Transactions. The quality of the securitized loan pools, and the likelihood that the loans would perform in a manner consistent with their represented and warranted attributes, depended directly on Capital One's origination and underwriting practices. Reflecting the centrality of the Transaction-Level Warranties to the parties' bargain, Capital One expressly agreed that Ambac is entitled to pursue any remedy available to it at law or in equity to address a breach by Capital One.

5.     Both the Loan-Level Warranties and the Transaction-Level Warranties, as well as the related remedies available to Ambac for breaches, were critical to Ambac's decision to issue the Policies. Had Ambac not received either set of warranties, or had Ambac known, as it now knows, that either set of warranties was utterly false, Ambac would not have issued the Policies and the Plaintiffs would not have incurred the millions of dollars in damages they have incurred and will continue to incur as a result.

3

6.      The loans securitized in the Transactions have defaulted at an

extraordinary rate.  As of September 25, 2012, loans accounting for nearly 15% of the aggregate

original principal balance of the securitization trusts for the Transactions have defaulted or are

severely delinquent.  The defaults have deprived the trusts of the cashflows necessary to pay

down the related securities.  Plaintiffs, in turn, have suffered substantial damages.  Tens of

millions of dollars in claims under the Policies have accrued, and Plaintiffs estimate hundreds of

millions of dollars in future claims.

7.      When the losses on the Transactions began to mount, Ambac, through its

counsel, retained a third-party consultant to review the documentation pertaining to thousands of

loans in the Transactions.  Ambac's consultant has to date reviewed 2,399 of the loans and has

found breaches of Capital One's Loan-Level Warranties in 2,081 loans, or almost 87%, with an

aggregate original principal balance of approximately $947 million.  (The defects discovered

also reveal breaches of Capital One's Transaction-Level Warranties.)  Ambac provided notice of

the breaches and detailed descriptions of the breaches attributable to each loan to all parties with

respect to 1,286 of these loans (those of the 2,081 breaching loans that have not been paid in

full).  Pursuant to the agreements governing the Transactions and at Ambac's request, the trustee

in turn demanded that Capital One comply with its contractual obligations to cure the breaches or

repurchase the breaching loans.  Capital One has failed to do so with respect to even a single

loan.

8.      The parties' agreements called for Capital One to transfer to the trusts

loans that complied with its representations and warranties in exchange for Ambac's absolute and

irrevocable insurance policies.  Ambac's loan-level reviews (supported by similar reviews

conducted by the mortgage-insurance companies that provided insurance on the loans

4

themselves) have revealed that Capital One did just the opposite: The pools of loans in the Transactions are replete with loans lacking the attributes that Capital One represented and warranted that the loans included in the Transactions would have. The securitized loans are instead plagued by rampant fraud and a wholesale abandonment of proper and prudent origination and underwriting practices.

9.      Plaintiffs are entitled to relief for Capital One's pervasive and material breaches of the parties' agreements, including damages sufficient to put Plaintiffs in the same place they would be in had Ambac never issued its Policies insuring the Transactions.

## THE PARTIES

10.      The actual and projected claims under the Policies contributed to the financial deterioration of Ambac, which is a Wisconsin-domiciled insurer. On March 24, 2010, the Wisconsin Office of the Commissioner of Insurance ("OCI") approved the creation of the Segregated Account pursuant to Wisconsin Statutes § 611.24. That same day, the Circuit Court for Dane County, Wisconsin, upon the Verified Petition of the Commissioner of Insurance (the "Commissioner"), placed the Segregated Account into statutory rehabilitation under Wisconsin Statutes §§ 645.31 and 645.32. Pursuant to Wisconsin Statutes § 611.24(3)(e), the Segregated Account is a separate Wisconsin insurer with the legal capacity and authority to sue in its own name and right. Ambac allocated the Policies and claims at issue in this action to the Segregated Account pursuant to the Plan of Operation for the Segregated Account attached to the Commissioner's Verified Petition (the "Plan of Operation").

11.      The Commissioner is the court-appointed Rehabilitator of the Segregated Account. As Rehabilitator, the Commissioner has the authority to prosecute the claims in this action on behalf of the Segregated Account. Pursuant to Wisconsin Statutes § 645.33(1), the

Commissioner has appointed a full-time Special Deputy Commissioner to rehabilitate the Segregated Account.

12.     Ambac is a Wisconsin corporation with its principal place of business in New York, New York.  Under the Plan of Operation, Ambac performs specified management services for the Segregated Account and retains the right to receive any cash recoveries relating to the policies and claims that were allocated to the Segregated Account, including the Policies and claims at issue in this action.

13.     Capital One, N.A. is a national banking association whose articles of association designate McLean, Virginia as the location of its main office.  In July 2009, Chevy Chase, which Capital One Financial Corporation had acquired earlier that year, merged with and into Capital One, N.A.  Accordingly, Capital One, N.A. has now succeeded by law to all of Chevy Chase's liabilities, including its liabilities as a contracting party in the Transactions. Capital One, N.A. is a wholly owned subsidiary of Capital One Financial Corporation.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

15.     This Court has personal jurisdiction over Capital One, and venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred, and Capital One is currently subject to personal jurisdiction, in the Southern District of New York.  Specifically, in its agreements with Ambac, Capital One irrevocably submitted to the "non-exclusive jurisdiction of the United States

District Court for the Southern District of New York."[2]  Capital One also "waive[d] and agree[d]
not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding,
any claim that it is not personally subject to the jurisdiction of such court[], that the suit, action
or proceeding is brought in an inconvenient forum, that the venue of the suit, action or
proceeding is improper or that the related documents or the subject matter thereof may not be
litigated in or by such court[]."[3]

## BACKGROUND

**A.      Pending Proceedings Against Capital One Involving the Transactions**

16.      There are currently four actions—one in Massachusetts federal court and
three in this Court—against Capital One alleging that it violated securities laws by making
numerous material misstatements and omissions in connection with several of the Transactions at
issue here.  *See Fed. Home Loan Bank of Boston v. Ally Fin.*, No. 1:11-CV-10952-GAO (D.
Mass.); *Landesbank Baden-Wurttemberg Spencerview Asset Mgmt. Ltd. v. Capital One Fin.
Corp.*, No. 1:12-cv-05907-MGC (S.D.N.Y.); *Landesbank Baden-Wurttemberg v. Capital One
Fin. Corp.*, No. 1:12-cv-05909-MGC (S.D.N.Y.); *Landesbank Baden-Wurttemberg Spencerview
Asset Mgmt. Ltd. v. Barclays Bank PLC*, No. 1:12-cv-05911-MGC (S.D.N.Y.).

17.      The pleadings in these matters allege that Capital One, like many other
banks, could not resist the monetary allure of securitization and did anything and everything to
reap as much financial reward as possible by virtue of its securitization practices.  Specifically,
the investor-plaintiffs in the cited matters allege that in connection with the relevant
Transactions, Capital One, among other things, systematically abandoned its underwriting

---

[2]      I&I Agreements § 6.05(a).

[3]      I&I Agreements § 6.05(a).

guidelines and granted unjustified exceptions to its guidelines; disregarded due-diligence and quality-control protocols in favor of maximizing loan volume; coerced appraisers to inflate their valuations of properties, again in order to permit as many loans as possible to close; and engaged in rampant predatory lending.

18.     Ambac's investigation confirms that these allegations apply to Capital One's practices across these Transactions as well.

**B.     The Transactions**

19.     The Transactions involved the securitization of adjustable-rate mortgage loans that were secured by first liens on one- to four-family residential properties.  Each of the Transactions proceeded in similar fashion.  Capital One pooled and securitized thousands of mortgage loans, with aggregate principal balances in the billions of dollars, that Capital One had originated or purchased from other originators.  These loans served as collateral for the issuance of privately offered mortgage-backed securities.  In total, the Transactions involved 12,675 loans with an aggregate original principal balance of more than $5.2 billion.  Ambac insured nearly $2.5 billion of the securities backed by the loans.

20.     The Transactions were effectuated through a series of agreements (the "Transaction Documents") executed by Chevy Chase and its affiliates.  The agreements governed, among other things, the rights and obligations of the various parties with respect to the mortgage loans and the securities that resulted from their securitization.

21.     Pursuant to a Mortgage Loan Purchase Agreement ("MLPA") for each Transaction, Chevy Chase sold and assigned its entire interest in the loans to its affiliate Chevy Chase Funding LLC ("Chevy Funding").

22.     Chevy Funding, in turn, acting as Depositor, sold its interest in the loans to a securitization trust pursuant to a Pooling and Servicing Agreement ("PSA") for each Transaction.  The trust then issued various classes of securities that would be paid down from the cashflow of principal and interest payments due on the pooled loans.  The securities were marketed privately to investors by means of a Private Placement Memorandum.  In each PSA, Capital One made numerous representations and warranties for the benefit of investors and Ambac concerning the quality of the mortgage loans and the practices pursuant to which they were supposedly originated (*i.e.*, the Loan-Level Warranties).  Capital One also committed to repurchase loans that breached those warranties.

23.     Then, in order to enhance the credit ratings and marketability of certain securities and its return on the Transactions, Capital One sought insurance policies from Ambac that would guarantee to the holders of those securities the receipt of certain payments.  Ambac's insurance made the securities more marketable because investors could look to Ambac for minimum principal and interest payments in the event that income from the loans in the trusts could not support those payments.  As a condition precedent to the Policies' issuance and as an inducement to Ambac, Capital One entered into an I&I Agreement with Ambac for each Transaction.  Under the I&I Agreements, Ambac agreed to issue the Policies for the benefit of holders of certain securities in each Transaction.

24.     In exchange, Capital One made numerous additional and broader representations and warranties to Ambac in the I&I Agreements with respect to Capital One's lending practices and the Transactions as a whole (*i.e.*, the Transaction-Level Warranties).  Under the I&I Agreements, Capital One also afforded Ambac broad and non-exclusive remedies, such as any relief "existing at law or in equity," and promised to reimburse and indemnify

9

Ambac in full in the event that, among other things, Capital One's Transaction-Level Warranties proved to be inaccurate or untrue or Capital One failed to comply with its obligations to repurchase individual loans that breached the Loan-Level Warranties.

25.     Relying on, among other things, Capital One's representations, warranties, disclosures, statements, covenants, and remedies contained in and encompassed by the I&I Agreements, the PSAs, the MLPAs, and the Private Placement Memoranda used to market the securities to investors and Ambac, Ambac issued a financial-guaranty insurance policy for each Transaction.  Under its Policies, Ambac agreed to insure certain payments of interest and principal with respect to the Class A-1I and Class A-NA securities issued in each Transaction (the "Insured Securities").  Ambac's insurance obligations under the Policies are absolute and irrevocable because the Policies are issued for the benefit of third-party investors.

26.     The following chart contains each of these relevant details for each Transaction:

| Transaction | Closing | # of Securitized Loans | Original Aggregate Principal Balance of Securitized Loans and Original Value of Issued Securities (approx.) | Original Value of Ambac-insured Securities (approx.) | PSA Date | I&I Agreement Date | Ambac's Policy Number |
|---|---|---|---|---|---|---|---|
| CC 2006-1 | Mar. 17, 2006 | 2,847 | $1.01 billion | $581 million | Mar. 1, 2006 | Mar. 17, 2006 | AB0978BE |
| CC 2006-2 | June 15, 2006 | 3,967 | $1.39 billion | $500 million | June 1, 2006 | June 15, 2006 | AB1003BE |
| CC 2006-3 | Sept. 12, 2006 | 1,972 | $855 million | $332 million | Sept. 1, 2006 | Sept. 12, 2006 | AB1022BE |
| CC 2006-4 | Dec. 7, 2006 | 1,260 | $563 million | $210 million | Dec. 1, 2006 | Dec. 7, 2006 | AB1049BE |
| CC 2007-1 | Mar. 15, 2007 | 1,372 | $668 million | $431 million | Mar. 1, 2007 | Mar. 15, 2007 | AB1065BE |
| CC 2007-2 | June 21, 2007 | 1,257 | $719 million | $425 million | June 1, 2007 | June 21, 2007 | AB1088BE |

C.      **Capital One's Representations and Warranties Allocate Risks Among the Parties**

27.     Capital One and Ambac played very different roles in the Transactions. Capital One originated or acquired and also serviced all of the loans.  Ambac insured certain securities for which the loans served as collateral.  Each party assumed risks consistent with these roles.

28.     Capital One assumed the risks associated with the origination, servicing, selection, and description of the loans included in each Transaction.  That is, Capital One accepted the risk that its representations, warranties, and disclosures about the loans, and about its practices with respect to the loans, were false or misleading.  Ambac, in turn, accepted the

risk that securitized pools of loans *conforming to Capital One's representations and warranties* might not perform as expected.

29.     Based on their respective roles, this was a reasonable allocation of risk between sophisticated parties.  Unlike Ambac, Capital One originated or acquired and serviced the loans and established the controls, protocols, and criteria governing the selection of loans for inclusion in the Transactions.  The risks associated with the origination, selection, servicing, and description of the loans, therefore, was entirely within Capital One's control.  As an insurer, Ambac was not involved in the process of vetting the borrowers to whom the loans were made.  Unlike Capital One, Ambac never owned any of the loans, never serviced the loans, and did not have access to the origination and servicing files for the loans before closing.  Ambac had no choice but to rely on the information given to it by Capital One.  Accordingly, Ambac reasonably assumed only the market risks that the loans, *as represented and warranted by Capital One*, might not perform as expected.

30.     Capital One made two types of representations and warranties to Ambac to effectuate this reasonable risk allocation:  the Loan-Level Warranties and the Transaction-Level Warranties.  Ambac sought and obtained Capital One's various representations and warranties precisely to cover specifically identified risks associated with the Transactions, including, in particular, the risk of loss associated with poorly underwritten loans, and loans that involved fraud by borrowers, brokers, appraisers, and anyone else involved in a loan's origination.  Capital One bore (and still bears) the risk associated with breaches of those representations and warranties, and Ambac bore (and still bears) the other risks associated with the loans, *on the condition that they conformed to Capital One's representations and warranties*.  That was the risk-allocation bargain that these sophisticated parties negotiated, and

is the bargain that Capital One has gutted.  Ambac would not have entered into the Transactions

and issued its Policies if it had known, as it now knows, that Capital One had materially and

pervasively breached either set of warranties.

**D.      The Loan-Level Warranties and Related Remedies**

      **1.      *The Loan-Level Warranties***

      31.      Capital One made numerous representations and warranties to Ambac

regarding, among other things, the attributes of the loans and the practices used to originate,

underwrite, and service the loans.  These Loan-Level Warranties, which Capital One made in

Section 2.04(a) of the PSAs (to which Ambac is an express third-party beneficiary) and remade

by reference in Section 2.01(l) of the I&I Agreements, were designed to convey to Ambac that

Capital One was standing behind the quality of the loans and, specifically, accepting the risk of

loss should any of the loans be found to have been included in the Transactions in violation of

any of the warranties.  Capital One's Loan-Level Warranties include the following with respect

to each loan in each of the Transactions:[4]

      PSAs § 2.04(a)(xxxiv).  "No fraud was committed by any Person
      (including, without limitation, [Chevy Chase], the related
      Mortgagor, the related appraiser or the related broker, if any) in
      connection with the origination and/or underwriting of any
      Mortgage Loan."

      PSAs § 2.04(a)(i).  "The information set forth in the Mortgage
      Loan Schedule is complete, true and correct in all material
      respects, and all information provided to the Rating Agencies
      directly by [Chevy Chase], including the loan level detail, is true
      and correct in all material respects."

---

[4]      The quoted Loan-Level Warranties are from Section 2.04(a) of the CC 2007-1 PSA.  Each of
these Loan-Level Warranties appears in the PSAs for the other Transactions, albeit not always in
the exact same numbered section.

PSAs § 2.04(a)(xxxvi).  "Each Mortgage Loan is and will be a Mortgage Loan arising out of [Chevy Chase]'s practice in accordance with [Chevy Chase]'s underwriting guidelines in place at the time of its origination."

PSAs § 2.04(a)(xxi).  "The origination practices and the collection practices used by [Chevy Chase] with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business."

PSAs § 2.04(a)(vii).  "Any and all requirements of any federal, state or local law . . . applicable to the Mortgage Loan and the related Mortgaged Property have been complied with . . . . Each Mortgage Loan, at the time it was made, complied in all material respects with all applicable predatory and abusive lending laws."

PSAs § 2.04(a)(xvii).  "[T]here is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and [Chevy Chase] has not waived any default, breach, violation or event of acceleration."

32.     The Loan-Level Warranties are therefore breached by, among other defects, loans made to borrowers (i) who do not qualify under the applicable underwriting guidelines or under prudent and proper origination practices; (ii) with unreasonable stated incomes or who otherwise have no reasonable ability to repay the loan; and/or (iii) who commit fraud by falsely representing their incomes, assets, liabilities, or intent to occupy their mortgaged properties.  As discussed below, the pools of loans securitized in the Transactions are replete with such defects and many others.

2.     *Remedies for Breaches of the Loan-Level Warranties*

33.     As a remedy for breaches of the Loan-Level Warranties, Capital One agreed in Section 2.04(b) of the PSAs to either cure the breaches or repurchase the breaching loans (the "Repurchase Protocol").  The Repurchase Protocol, which gave Ambac further assurance of Capital One's commitment to bear the risk of loss for loans that did not comply with

14

the Loan-Level Warranties, applies to any loan that suffers from one or more breaches of the Loan-Level Warranties—as long as the "breach or breaches, individually or in the aggregate, materially and adversely affect the interests of . . . Ambac . . . in respect of such Mortgage Loan." If that standard is met, "prompt written notice" must be given by the party discovering the breach or breaches to all of the other relevant parties. U.S. Bank National Association, as trustee for the Transactions ("U.S. Bank"), must in turn notify Capital One of the breach or breaches and demand that Capital One cure the breach or breaches within 60 days. At that point, Capital One has the option of either curing the breach or breaches or repurchasing the related breaching loan from the related trust.[5] As described below, Ambac gave notice of almost 1,300 breaching loans and detailed descriptions of the breaches attributable to each loan to all parties in the Transactions, and U.S. Bank, acting as trustee and at the request of Ambac, in turn demanded that Capital One repurchase these loans. ***Incredibly, Capital One has refused to repurchase even a single breaching loan***.

34.     This Repurchase Protocol was intended to **quickly and efficiently address** the inadvertent inclusion in each Transaction of the aberrant non-complying loan; it was not intended to be an alternative to Capital One's compliance with the extensive Loan-Level Warranties it made to Ambac. **Capital One has already admitted as much. In** response to several of Ambac's demands for Capital One to comply with the Repurchase Protocol with respect to loans identified by Ambac as breaching Capital One's Loan-Level Warranties, Capital One has repeatedly refused on grounds that "Section 2.04(b) [of the PSAs] was intended to address situations in which alleged breaches of representations and warranties, if any, were brought to

---

[5]     Capital One also agreed to a third option—substituting a non-breaching loan for a breaching loan—but that option lapsed two years after the closing of each Transaction. Accordingly, the substitution option is no longer available to Capital One.

the attention of the Chevy Chase Bank promptly and in small numbers,"[6] and "Section 2.04(b) does not contemplate a bulk demand to repurchase 244 loans all at once."[7] Capital One's position is that "a bulk demand violates both the letter and the purpose of Section 2.04(b)." Capital One's refusal to repurchase even a single loan in response to Ambac's and U.S. Bank's repurchase demands is in clear violation of the Transaction Documents.  However, even if Capital One were repurchasing breaching loans, which it is not, Ambac agrees that the Repurchase Protocol was not intended, and would be inadequate, to address the pervasive, systemic fraud and underwriting deficiencies plaguing the loans that Ambac has uncovered. Failings on such a large scale are best addressed by more global relief.

**E.      Transaction-Level Warranties and Related Remedies**

  **1.      *The Transaction-Level Warranties***

35.      As evidence of the parties' mutual understanding of the particular inadequacy of the Repurchase Protocol to address pervasive breaches of the Loan-Level Warranties, the parties provided broader rights and remedies to Ambac in the I&I Agreement, to which Ambac is a direct party.  These broader rights and remedies include the Transaction-Level Warranties and Ambac's right to pursue any and all claims "at law or in equity" if Capital One breaches any warranty or fails to comply with the Repurchase Protocol.

36.      In the I&I Agreements, Capital One granted numerous additional and broader rights and remedies to Ambac (and Ambac only).  Among these contractual protections are representations and warranties as to the accuracy and completeness of all of the information furnished to Ambac about, among other things, Capital One's compliance with mortgage-lending

---

[6]      Capital One's October 22, 2010 response to Ambac's August 25, 2010 breach-notice letters.

[7]      Capital One's August 23, 2011 response to Ambac's June 24, 2011 breach-notice letters.

and securities laws, its financial condition, its operations, its mortgage-loan portfolios, its

origination and underwriting practices, and the attributes of the loans included in each of the

Transactions on a pool-wide basis. These Transaction-Level Warranties include the following:

> I&I Agreements § 2.01(j). "*Accuracy of Information.* Neither the Company Documents[8] nor other information relating to the Mortgage Loans, the operations of Chevy Chase or the financial condition of Chevy Chase (collectively, the 'Chevy Chase Documents'), . . . furnished to [Ambac] by Chevy Chase contains any statement of a material fact which was untrue or misleading in any material respect when made. . . . Since the furnishing of the Chevy Chase Documents, there has been no change nor any development or event involving a prospective change known to Chevy Chase that would render any of the Chevy Chase Documents untrue or misleading in any material respect."

> I&I Agreements § 2.01(g). "*Financial Statements.* The Financial Statements of Chevy Chase, copies of which have been furnished to [Ambac] (i) are . . . complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of Chevy Chase . . . and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied . . . . Since the date of the most recent Financial Statements, there has been no Material Adverse Change in respect of Chevy Chase. Except as disclosed in the Financial Statements, Chevy Chase is not subject to any contingent liabilities or commitments that . . . have a material possibility of causing a Material Adverse Change in respect of Chevy Chase."

> I&I Agreements § 2.01(k). "*Compliance with Securities Laws.* [T]he [Private Placement Memorandum] does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading . . . ."

37.    As the plain language of these Transaction-Level Warranties makes clear,

Capital One was attesting to, among other things, the truth, accuracy, and completeness of all of

---

[8]    Section 1.01 of the I&I Agreements defines "Company Documents" to mean the I&I Agreement, the PSA, and the MLPA for each Transaction.

the written and electronic documentation that it had provided to Ambac before the closing of each Transaction.  This documentation included (i) the mortgage-loan "tapes," which were large spreadsheets that contained key attributes (*e.g.*, loan-to-value ratios, FICO or credit scores, and appraisal value and occupancy status of mortgaged properties) for assessing the borrowers' ability to repay their loans and the sufficiency of the mortgaged properties as collateral for the loans, and (ii) the Private Placement Memoranda, which were used to market the securities in the Transactions (including the Insured Securities) to investors and which purported to describe both the attributes of the loans and the practices used in originating and underwriting the loans.

38.     These documents provided important information to Ambac about the quality of Capital One's business practices generally.  The documents purported to paint a picture of Capital One as a prudent and responsible mortgage lender.  For example, the Private Placement Memoranda state that the loans in each Transaction "were originated generally in accordance with Chevy Chase's underwriting guidelines," and then go on to describe those guidelines as being designed to evaluate borrowers' "creditworthiness."  The Private Placement Memoranda also state that "underwriting personnel perform a manual review of most mortgage loan documentation before Chevy Chase will accept or reject a loan."  By attesting to the truth, accuracy, and completeness of these documents, the Transaction-Level Warranties acted as a guarantee that Capital One acted prudently and responsibly in originating the loans in the Transactions.  They were a guarantee that Capital One underwrote loans that conformed with its purportedly conservative and rigorous underwriting standards and that any non-conforming loans were the exception, not the rule.  And they were a guarantee that Capital One did not engage in wholesale, rampant misconduct or negligence resulting in a portfolio replete with defective loans.

18

39.     The Transaction-Level Warranties thus further memorialized Capital One's acceptance of the risk of loss if its disclosures misstated or omitted material facts.  As discussed below, Capital One's disclosures were in fact false and misleading.  Both the mortgage-loan tapes and the Private Placement Memoranda materially misrepresented key loan attributes and the quality of the origination and underwriting of the loans in each Transaction. The Private Placement Memoranda also omitted material facts because they failed to disclose that the loans were infected by fraud and other gross underwriting failings and were the product of abysmal origination practices.

2.     *Remedies for Breaches of the Transaction-Level Warranties*

40.     The Transaction-Level Warranties are different than the Loan-Level Warranties not only in terms of their scope, but also in terms of the remedies available to Ambac for their breach.  As noted, the Loan-Level Warranties come with a contractually specified mechanism—the Repurchase Protocol—for remedying breaches, reflecting an expectation that such breaches would be rare.

41.     The Transaction-Level Warranties are accompanied by no contractual mechanism for remedying breaches, or restrictions as to available remedies.  To the contrary, Section 5.02 of the I&I Agreements entitle Ambac to as broad a slate of remedies as possible for breaches of the Transaction-Level Warranties—specifically, any and all claims available to Ambac "at law or in equity."

42.     That flexibility is precisely what Ambac required as a condition precedent to issuing its Policies.  In order to issue the Policies, Ambac required more than the rights and remedies it had by virtue of its status as an express third-party beneficiary of the PSAs— specifically, the right to enforce the Repurchase Protocol.  Specifically, Ambac required the

execution of the I&I Agreements, providing Ambac with direct—and much broader—rights and remedies. These include the Transaction-Level Warranties, the ability to pursue any remedy "at law or in equity" for breaches of those warranties (or for non-compliance with the Repurchase Protocol), the right to indemnification from Capital One, plus interest, for claims made under the Policies as a result of Capital One's breaches, misstatements, or other misconduct,[9] and the right to reimbursement from Capital One, again plus interest, for claims made under the Policies as a result of Capital One's non-compliance with the Repurchase Protocol and for any costs and expenses incurred in enforcing, defending, and preserving Ambac's rights.[10] To underscore the breadth and unqualified nature of these representations, warranties, covenants, and remedies, Capital One agreed that its obligations were absolute and irrespective of any defenses it might have against Ambac:

> *The obligations of Chevy Chase . . . hereunder shall be absolute and unconditional* and shall be paid or performed strictly in accordance with this Insurance Agreement under all circumstances irrespective of: . . . (iii) the existence of any claim, setoff, defense, reduction, abatement or other right that Chevy Chase . . . may have at any time against [Ambac] . . . (vii) any other circumstances, other than payment in full, that might otherwise constitute a defense available to, or discharge of, Chevy Chase . . . in respect of any Company Document.[11]

43.     Ambac required these numerous and broad contractual protections from Capital One as fundamental consideration for issuing the Policies. Capital One gutted the parties' explicit bargain, and Ambac has the right to recover in whatever manner at law or in

---

[9]     *See* I&I Agreements §§ 3.04(a) and 3.03(d).

[10]    *See* I&I Agreements §§ 3.03(b), (c), and (d).

[11]    *See* I&I Agreements § 4.03(a).

equity it believes is necessary or desirable in its judgment to remedy Capital One's various wrongs.

## F.    Capital One's Material Breaches

44.    The loans in the Transactions have woefully underperformed, and Ambac is obligated to pay tens of millions of dollars in claims under its Policies as a result and projects additional claims going forward in the hundreds of millions of dollars.  After it became apparent that Ambac would incur substantial claims on these Transactions, Ambac's litigation counsel hired a third-party consultant to "re-underwrite" thousands of the loans to determine whether they complied with Capital One's Loan-Level Warranties.

45.    The results of Ambac's loan-level review have been staggering.  Of the 2,399 total loans reviewed across all of the Transactions, Ambac's third-party consultant has found breaches of Capital One's Loan-Level Warranties in 2,081—or almost 87%—with an aggregate original principal balance of almost $947 million.  The review consisted of random samples of approximately 400 loans drawn from each of the six Transactions.  The random sample for each Transaction was carefully drawn to ensure it was (and is) representative of all of the loans in the related Transaction.  In these random samples, Ambac's third-party consultant found breaches of Capital One's Loan-Level Warranties in the following astoundingly high percentages:

| Transaction | Percentage of Breaching Loans in Random Sample |
|---|---|
| CC 2006-1 | 84.50% |
| CC 2006-2 | 85.75% |
| CC 2006-3 | 87.19% |
| CC 2006-4 | 84.79% |
| CC 2007-1 | 88.50% |
| CC 2007-2 | 89.75% |

The breaches identified evince gross malfeasance, misconduct, and negligence in connection with the origination and underwriting of the loans that Capital One pooled, and a wholesale abandonment of any attempt to gauge the ability and willingness of borrowers to repay their obligations. The random-sample analysis demonstrates at a very high (95%) confidence interval that breaches of Capital One's Loan-Level Warranties exist in a comparable percentage of loans *in the total loan pool* for each Transaction.

46.     Specifically, the identified breaching loans contain one or, in most cases, more than one defect that constitute a breach of one or more of Capital One's Loan-Level Warranties (and also, as discussed below, the Transaction-Level Warranties). These defects include:

- rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- inflated and fraudulent appraisals; and

- pervasive violations of Capital One's underwriting guidelines and proper, prudent, and customary mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with debt-to-income and loan-to-value ratios above the allowed maximums, or (iii) with relationships to Capital One or other non-arm's-length relationships.

47.     Individually or in the aggregate, the identified breaches of Capital One's Loan-Level Warranties materially and adversely affected Ambac's interests in the identified loans. Loans that are not appropriately originated and underwritten, such as by being infected by

fraud, or the key attributes of which are otherwise misrepresented, are markedly more risky and

therefore less valuable than loans not suffering from such defects.

48. To date, Ambac has notified Capital One of the breaches of the Loan-

Level Warranties in 1,286 loans with an aggregate original principal balance of almost $643

million.[12] As provided for under the Transaction Documents and at Ambac's request, U.S. Bank

has in turn sent a series of ten letters to Capital One demanding that it comply with its

obligations under the Repurchase Protocol to repurchase the identified breaching loans. *In

response, Capital One has expressly refused to repurchase a single breaching loan*. In its

rejection letters, Capital One not only has conceded the inadequacy of the Repurchase Protocol

to remedy breaches of the magnitude uncovered by Ambac, but also has made numerous

demands for additional information and excuses for its rejections that find no support whatsoever

in the Transaction Documents.  Like the breaches themselves, Capital One's still-unremedied

failure to comply with the Repurchase Protocol constitutes an "Event of Default" under Section

5.01 of the I&I Agreements.

49. In addition, the type and number of defects uncovered by Ambac during

its loan-level reviews also reveal the falsity of the Transaction-Level Warranties that Capital One

made to Ambac.  The documents to whose truth, accuracy, and completeness the Transaction-

Level Warranties attest—in particular, the mortgage-loan tapes and the Private Placement

Memoranda—painted for Ambac a rosy picture of prudent origination and underwriting practices

at Capital One and loans that complied with those practices.  But the results of Ambac's loan-

---

[12]     Ambac did not request that the trustee notify Capital One of 795 breaching loans that had been
paid in full.

level reviews reveal the exact opposite—rampant fraud and numerous other underwriting deficiencies in the loans in the Transactions.

50.    In short, Capital One materially and pervasively breached both the Loan-Level Warranties and the Transaction-Level Warranties, as well as the I&I Agreements as a whole, by making materially false and misleading disclosures, and omitting material information, pertaining to its mortgage-lending operations and the loans in the Transactions.  Significantly, in direct contravention of its representations and warranties, the loans were not originated or underwritten pursuant to Capital One's stated origination and underwriting practices, and certainly not pursuant to prudent, proper, and customary lending practices.

**G.    Ambac's Re-underwriting Results Are Confirmed by Independent Findings by Third-Party Mortgage Insurers**

51.    Recent, independent findings by the companies providing insurance on some of the loans themselves (as opposed to coverage of the loan-backed securities, which are what Ambac insures) confirm Ambac's re-underwriting results.  This type of insurance—known as mortgage insurance—covers a borrower's failure to pay off his or her loan, and was relied upon by Ambac at the time the Transactions were negotiated as an additional layer of protection from claims payments (*i.e.*, tens of millions of dollars of additional external credit enhancement). After an insured loan is liquidated or the loan's underlying property is foreclosed on, the servicer of the loan will seek payment from the mortgage insurer, and the mortgage insurer will either approve or deny the request, looking at factors such as whether the loan was properly issued in the first place—*i.e.*, many of the same factors that Ambac looked at during its re-underwriting work.

52.    As communicated to Capital One and Ambac by Specialized Loan Servicing LLC, the new servicer for the Transactions, the mortgage insurers for many of the

loans in the Transactions have rescinded their insurance policies with respect to numerous loans on account of, among other things, "various deficiencies in the origination of the mortgage loans." The mortgage insurers specify the origination deficiencies in detail, citing issues such as misrepresentations of borrowers' income, assets, and debt obligations, as well as inflated appraisals—*i.e.*, precisely the types of deficiencies that Ambac independently uncovered during its re-underwriting work. To date, the mortgage insurers have rescinded their policies on these grounds with respect to hundreds of loans in the Transactions, and Ambac continues to receive notice of additional rescissions on a regular basis. Dozens of the loans for which the mortgage insurers have rescinded coverage were also among the 1,286 loans that Ambac independently identified as defective and, through U.S. Bank, demanded that Capital One repurchase. These independent findings by third-party mortgage insurers confirm the poor quality of the loans that Capital One included in the Transactions and corroborate Ambac's re-underwriting findings.

53.     Similarly, on February 3, 2012, U.S. Bank, as trustee acting at the direction of a holder of several securities issued in four of the Transactions, demanded that Capital One repurchase 141 loans with an aggregate original principal balance of nearly $48 million for which mortgage-insurance coverage had been rescinded. These additional repurchase demands further support Ambac's findings of pervasive breaches throughout the loan pools for the Transactions. They also provide further evidence that Capital One has no intention whatsoever of complying with its repurchase obligations—as with Ambac's repurchase demands, Capital One has not repurchased even one of the 141 loans at issue in the February 3, 2012 demand from U.S. Bank.

**H.    The Plaintiffs Have Suffered Tremendous
Harm and Are Entitled to Relief**

54.    The Transactions that Capital One marketed and effectuated based on its

materially false and misleading representations and warranties and disclosures have failed

miserably.  A very high percentage of the loans that Capital One securitized in each of the

Transactions either have defaulted or are severely delinquent, causing massive shortfalls in the

cashflows of principal and interest needed to pay down the Insured Securities.  As a result, the

holders of the Insured Securities have incurred or will incur severe losses that have been or will

be passed on to Ambac as the financial guarantor.

55.    As of September 25, 2012, the Transactions have experienced cumulative

collateral losses of more than $753 million.  A significant portion of the loans have defaulted or

are severely delinquent, as reflected in the following table:

| Transaction | Cumulative Collateral Losses | % of Loans Severely Delinquent, Liquidated, in Foreclosure, Bankruptcy, or REO (by Original Loan Balance) |
|---|---|---|
| CC 2006-1 | $94.2 million | 14.63% |
| CC 2006-2 | $157.3 million | 19.79% |
| CC 2006-3 | $132.7 million | 23.33% |
| CC 2006-4 | $98.8 million | 28.09% |
| CC 2007-1 | $120.2 million | 30.07% |
| CC 2007-2 | $150.4 million | 35.85% |

56.    The severe losses realized by the Transactions have resulted in Plaintiffs

being obligated to pay claims under the Policies to holders of the Insured Securities.  Due to the

high rate of delinquency and expected defaults, future borrower re-payment shortfalls affecting

the Transactions are inevitable.  In short, Plaintiffs have suffered and will continue to suffer very

substantial damages as a result of Capital One's pervasive breaches of its contractual obligations.

57.     As discussed above, the pervasive breaches of Capital One's representations and warranties, revealed by Ambac's and the mortgage-insurers' loan-level reviews and corroborated by the dismal loan performance of the Transactions, pierce the very heart of the bargain struck by the parties.  As only became clear after Ambac's re-underwriting, Capital One did not sell to the trusts for the Transactions pools of loans with the represented and warranted attributes.  Rather, Capital One transferred pools where the overwhelming majority of loans did not bear any resemblance to the loans that Capital One represented and warranted would comprise the pools.  Contrary to Capital One's representations and warranties, the loans were infected by fraud and other underwriting failures.  Ambac never would have issued its Policies or agreed to participate in the Transactions had it known the truth.

58.     Capital One's misconduct entitles Plaintiffs to be, among other things, (i) returned to the position they would be in had Ambac not issued its Policies and (ii) compensated for the incremental harm incurred as a result of Ambac's participation in each of the Transactions.  At the very least, this relief requires the payment to Plaintiffs of all claims payments accrued to date and all claims payments required to be made in the future under the Policies.

## FIRST CAUSE OF ACTION

### (Breach of Loan-Level Warranties)

59.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 58 of this Complaint.

60.     The I&I Agreements are valid and binding agreements between Ambac and Capital One, among other parties.

61.     Ambac has performed all of its obligations under the I&I Agreements.

62.    The PSAs are valid and binding agreements with respect to which Ambac is an express third-party beneficiary.

63.    Capital One has materially breached its representations and warranties under Section 2.04(a) of the PSAs and Section 2.01(l) of the I&I Agreements.

64.    As a result of Capital One's breaches, Plaintiffs have been damaged and will continue to be damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Breach of the Repurchase Protocol)

65.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 64 of this Complaint.

66.    Capital One has materially breached its obligations under the Repurchase Protocol by refusing to cure or repurchase any of the mortgage loans that breached Capital One's Loan-Level Warranties and with respect to which Ambac has provided notice of breach to Capital One and, through U.S. Bank, demanded that Capital One comply with the Repurchase Protocol.

67.    As a result of Capital One's breaches, Plaintiffs have been damaged and will continue to be damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Material Breach of the I&I Agreement)

68.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 67 of this Complaint.

69.    Capital One persuaded Ambac to enter into the I&I Agreements and to issue the Policies by making extensive representations and warranties concerning the loans in the

Transactions and by agreeing to broad remedies for breaches of those representations and warranties.

70.     Capital One's representations and warranties and related commitments to remedy breaches of those representations and warranties were material (and contractual conditions precedent) to Ambac's decision to insure the Transactions, and Ambac was persuaded thereby to enter into the I&I Agreements, to issue its Policies, and to perform its obligations under the I&I Agreements and the Policies.

71.     Capital One has materially breached the I&I Agreements by, among other things, pervasively breaching the Transaction-Level Warranties.

72.     As a result of Capital One's breaches, Plaintiffs have been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Indemnification)

73.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 72 of this Complaint.

74.     Pursuant to Section 3.04(a) of the I&I Agreements, Ambac is entitled to be indemnified by Capital One for all claims, losses, liabilities, demands, damages, costs, or expenses (including attorneys' and consultants' fees) of any nature arising out of or relating to, among other things, (i) the occurrence of an "event of default" under the Transaction Documents, including breaches of Capital One's Transaction-Level Warranties and Capital One's failure to comply with the Repurchase Protocol in the PSAs, (ii) Capital One's negligence, bad faith, willful misconduct, misfeasance, malfeasance, or theft committed in connection with the

29

Transactions or relating to the Transaction Documents, and (iii) any material misstatement or omission in the Private Placement Memoranda.

75.    In addition, Section 3.03(d) of the I&I Agreements requires Capital One to pay Ambac interest on any and all amounts recovered as indemnification under Section 3.04(a) of the I&I Agreements.

76.    Numerous "events of default" have occurred under the Transaction Documents, including pervasive breaches of Capital One's Transaction-Level Warranties and Capital One's wholesale failure to comply with the Repurchase Protocol, Capital One has committed negligence, misfeasance, malfeasance, and acts of bad faith in connection with the Transactions or related to the Transaction Documents, and the Private Placement Memoranda contain numerous material misstatements or omit material information—all of which has caused and will continue to cause Plaintiffs to incur and pay claims and other losses, costs, and expenses.

77.    Plaintiffs are entitled to indemnification by Capital One for such payments, losses, costs, and expenses, plus interest, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Reimbursement)

78.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 77 of this Complaint.

79.    Pursuant to Section 3.03(b) of the I&I Agreements, Capital One agreed to reimburse Ambac for any payments made under the Policies arising as a result of Capital One's failure to repurchase any loan as required under the Repurchase Protocol in Section 2.04(b) of the PSAs.

30

80.    Pursuant to Sections 3.03(c) of the I&I Agreements, Capital One also agreed to reimburse Ambac for any and all charges, fees, costs, and expenses, including attorneys' fees, paid or incurred in connection with, among other things, enforcing, defending, or preserving Ambac's rights under the Transaction Documents.

81.    In addition, Section 3.03(d) of the I&I Agreements requires Capital One to pay Ambac interest on any and all amounts recovered as reimbursement under Section 3.03(b) and Section 3.03(c) of the I&I Agreements.

82.    Plaintiffs have incurred and will pay claims under the Policies arising as a result of Capital One's failure to repurchase loans as required under the Repurchase Protocol in Section 2.04(b) of the PSAs, and have incurred and will continue to incur numerous costs and expenses, including attorneys' fees and expert fees, to enforce, defend, and preserve Ambac's rights under the Transaction Documents.

83.    Plaintiffs are entitled to reimbursement from Capital One of those payments and costs and expenses, plus interest, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

A.    For an award of legal, equitable, and any other present and future damages to be proven at trial, including all claims that have accrued under the Policies to date and all claims due for payment in the future under the Policies;

B.    For an order compelling Capital One to comply with its obligations under the Repurchase Protocol in Section 2.04(b) of the PSAs to cure or repurchase each of the loans that breach its Loan-Level Warranties;

C.    For an order of indemnification, including interest, for the claims under the Policies and other losses, costs, and expenses that Plaintiffs have paid or will pay in the future that arise out of or relate to the occurrence of events of default under the Transaction

Documents, Capital One's negligence, misfeasance, malfeasance, and acts of bad faith in connection with the Transactions or related to the Transaction Documents, and material misstatements or omissions in the Private Placement Memoranda, pursuant to I&I Agreements §§ 3.04(a) and 3.03(d);

D.     For an order awarding reimbursement of Plaintiffs' claims payments under the Policies arising as a result of Capital One's failure to comply with the Repurchase Protocol, and Plaintiffs' attorneys' fees and other costs and expenses incurred in enforcing, defending, or preserving Ambac's rights under the Transaction Documents, plus interest, pursuant to I&I Agreements §§ 3.03(b), (c), and (d);

E.     For an order of prejudgment interest; and,

F.     For an order awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            October 24, 2012

                                Respectfully submitted,

                                PATTERSON BELKNAP WEBB & TYLER LLP


                                _____
                                Philip R. Forlenza (*prforlenza@pbwt.com*)
                                Peter W. Tomlinson (*pwtomlinson@pbwt.com*)
                                Henry J. Ricardo (*hjricardo@pbwt.com*)
                                Benjamin S. Litman (*blitman@pbwt.com*)
                                1133 Avenue of the Americas
                                New York, NY  10036-6710
                                Telephone:  (212) 336-2000
                                Fax:  (212) 336-2222

                                *Attorneys for Ambac Assurance Corporation and*
                                *the Segregated Account of Ambac Assurance*
                                *Corporation*



                                Of Counsel:

                                FOLEY & LARDNER LLP
                                Jeffrey A. Simmons* (*jsimmons@foley.com*)
                                150 East Gilman Street
                                Verex Plaza
                                Madison, Wisconsin 53703-1481
                                Telephone:  608) 257-5035
                                Fax:  (608) 258-4258

                                *intends to apply for *pro hac vice* admission

                                *Attorneys for the Segregated Account of Ambac*
                                *Assurance Corporation*