**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION and THE SEGREGATED ACCOUNT OF AMBAC ASSURANCE CORPORATION,<br><br>    Plaintiffs,<br><br>    -against-<br><br>CAPITAL ONE, N.A., as successor by merger to CHEVY CHASE, F.S.B.,<br><br>    Defendant. | 12-cv-7937 |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

James A. Murphy
Cameron S. Matheson
Murphy & McGonigle, PC
4870 Sadler Road, Suite 301
Glen Allen, Virginia 23060
(804) 762-5320

James K. Goldfarb
Soren E. Packer
Murphy & McGonigle, PC
60 East 42nd Street, Suite 5230
New York, New York 10165
(212) 880-3961

*Attorneys for Defendant Capital One, N.A.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

The Nature of this Case ...........................................................................1

The Parties ...............................................................................................1

The Loans ................................................................................................2

The Issues ................................................................................................2

STANDARD OF REVIEW ............................................................................5

STATEMENT OF FACTS ............................................................................6

The Pooling and Servicing Agreement ...................................................7

The Insurance and Indemnity Agreement ...............................................9

The Allegedly Breaching Loans .............................................................11

ARGUMENT ..................................................................................................11

I.    REPURCHASE IS THE SOLE AND EXCLUSIVE REMEDY FOR THE
BREACHES ALLEGED BY AMBAC. ................................................11

A.   The parties agreed that repurchase would be the sole remedy for the
breaches of warranties alleged by Ambac. .....................................11

B.   Ambac's distinction between "Loan Level" and "Transaction Level"
warranties is meaningless and irrelevant. ......................................14

1.   Ambac's interpretation is contradicted by the I&I itself. ...........15

2.   Ambac's distinction based on supposed warranty "levels" lacks factual
and textual support. ...............................................................16

3.   Ambac's distinction based on supposed warranty "levels" violates the
rules of contract interpretation. .............................................17

II.   AMBAC'S CLAIMS ARE DEFECTIVE AS A MATTER OF LAW AND
SHOULD BE DISMISSED. ..................................................................18

A.   Ambac failed to give notice of defects to Capital One for most of the
loans at issue and its first cause of action should be dismissed in substantial
part. ..............................................................................................18

B.   Ambac's second cause of action for breach of the repurchase protocol
should be dismissed. ......................................................................21

C.   Ambac's third cause of action for material breach of the I&I should be
dismissed. .....................................................................................22

1.   The cause of action is precluded by the exclusive remedy of
repurchase. ............................................................................22

    2.   Rescissionary remedies are barred. ...................................................................22

        a.   By accepting premiums, Ambac has waived any right to rescind. ......................... 23

        b.   A rescissionary remedy is barred by the inequitable result Ambac seeks. ............. 25

  D.   Ambac's fourth cause of action for indemnification should be dismissed. ....................26

    1.   Indemnification is precluded by the terms of the I&I. ...............................................26

        a.   The I&I expressly precludes indemnification here. ................................................. 26

        b.   The exclusive remedy provisions preclude indemnification. ................................. 27

    2.   The count seeking indemnity will not lie because there is no
underlying third-party action against Ambac. ....................................................................28

  E.   Ambac's fifth cause of action for reimbursement should be dismissed.........................29

CONCLUSION...........................................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

## Cases

*ALJ Capital I, L.P. v. David J. Joseph Co.*,
  2007 N.Y. Slip. Op. 50867(U) (Mar. 13, 2007) ...................................................... 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 5

*Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*,
  2012 N.Y. Slip Op. 52001(U) (Oct. 11, 2012) ................................................. 23, 24

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  No. 11-cv-2375 (JSR), 2011 WL 5335566 (S.D.N.Y. Oct. 31, 2011) .................. 12, 13, 27, 28

*Assured Guar. Mun. Corp. v. UBS Real Estate Secs. Inc.*,
  No. 12-cv-1579, 2012 WL 5927379 (S.D.N.Y. Nov. 21, 2012) ............................. 23

*Bank of Am., N.A. v. Column Fin., Inc.*,
  10-cv-6378, 2011 WL 2652464 (S.D.N.Y. July 6, 2011) ....................................... 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................... 5

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y. 2011) ................................................................. 26, 28

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*,
  No. 5140-CS, 2012 WL 3201139 (Del. Ch. Aug. 7, 2012) ................................... 20

*Citibank, N.A. v. United Subcontractors, Inc.*,
  581 F. Supp. 2d 640 (S.D.N.Y. 2008) ................................................................. 22

*DBT Gmbh v. J.L. Mining Co.*,
  544 F. Supp. 2d 364 (S.D.N.Y. 2008) ................................................................. 18

*ECA v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .............................................................................. 5

*ESPN, Inc. v. Office of Comm'r of Baseball*,
  76 F. Supp. 2d 383 (S.D.N.Y. 1999) ................................................................. 23

*Exxon Mobil Corp. v. Tredegar Corp.*,
  11-cv-2829 MGC, 2012 WL 4027577 (S.D.N.Y. Sept. 13, 2012) ......................... 5

*Goshawk Dedicated Ltd. v. Bank of N.Y.*,
  No. 06-cv-13758, 2010 WL 1029547 (S.D.N.Y. Mar. 15, 2010) ........................... 28

*Gotham Partners, L.P. v. High River Ltd. P'ship*,
  76 A.D.3d 203 (1st Dep't. 2010) ....................................................................... 28

*Heimbach v. Metro. Transp. Auth.*,
  75 N.Y.2d 387 (1990) ........................................................................................ 26

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
  74 N.Y.2d 487 (1989) ........................................................................................... 28

*Kel-Tech Const., Inc. v. N.Y.C. Hous. Auth.*,
  79 A.D. 3d 607 (1st Dep't. 2010)......................................................................... 20

*Lasker-Goldman Corp. v. City of New York*,
  221 A.D.2d 153 (1st Dep't. 1995)......................................................................... 12

*Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*,
  793 F. Supp. 2d 1189 (W.D. Wash. 2011) ........................................................... 27

*Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC*,
  386 F. Supp. 2d 421 (S.D.N.Y. 2005) ................................................................... 13

*M & T Mortg. Corp. v. Foy*,
  20 Misc. 3d 274 (Sup. Ct. N.Y. County 2008) ..................................................... 25

*Maniolos v. United States*,
  741 F. Supp. 2d 555 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir.
  2012)......................................................................................................................... 5

*MASTR Asset Backed Secs. Trust 2006-HE3*,
  *by U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*,
  843 F. Supp. 2d 996 (D. Minn. 2012) ................................................ 12, 19, 20, 27

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
  84 N.Y.2d 430 (1994) ........................................................................................... 22

*Red Sea Tanker Fund Ltd. v. Chase Manhattan Bank, N.A.*,
  No. 99-7282, 1999 WL 973503 (2d Cir. Oct. 6, 1999) ........................................ 27

*Roth v. Jennings,* 489 F.3d 499,
  (2d Cir. 2007) .......................................................................................................... 5

*Sequa Corp. v. Gelmin*,
  851 F. Supp. 106 (S.D.N.Y. 1994) ....................................................................... 28

*Symphony Space, Inc. v. Pergola Props., Inc.*,
  214 A.D.2d 66 (1st Dep't 1995), *aff'd*, 88 N.Y.2d 466 (1996)............................. 23

*In re U.S. Lines, Inc.*,
  318 F.3d 432 (2d Cir. 2003).................................................................................. 25

*Verzani v. Costco Wholesale Corp.*,
  641 F. Supp. 2d 291 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 50 (2d Cir.
  2010)................................................................................................................... 5, 17

*In re Westmoreland Coal Co. v. Entech, Inc.*,
  100 N.Y.2d 352 (2003) ......................................................................................... 12

## PRELIMINARY STATEMENT

*The Nature of this Case*

This case arises from the securitization of mortgage loans originated by Chevy Chase Bank and deposited by a Chevy Chase Bank-related entity into six securitization trusts collateralized by the loans. Ambac Assurance Corporation provided financial guaranty insurance for the investors in the trusts.

*The Parties*

Chevy Chase Bank, F.S.B. was a federally chartered and federally insured stock savings bank that, among other things, made mortgage loans to the public. Chevy Chase Bank was acquired by Capital One in February 2009, after the closing of the securitization trusts at issue here.[1] Shortly before that acquisition, Chevy Chase had $11.4 billion of deposits and 292 branches, making it the D.C. area's fifth-largest bank.

Ambac Assurance Corporation is a Wisconsin-domiciled stock insurance corporation. In 2010, Ambac was placed in statutory rehabilitation by the Wisconsin Commissioner of Insurance for the purpose of restoring it to a sound financial condition. The rehabilitation process included the creation of the plaintiff Segregated Account of Ambac Assurance Corporation. Compl. ¶¶ 10-12. Upon information and belief, as of December 26, 2012, Ambac has made no payments on the "tens of millions of dollars" of insurance claims submitted by the trustee for the six trusts at issue here.[2] Compl. ¶ 6.

---

[1] Capital One's acquisition of Chevy Chase Bank occurred thirty-five months after the first securitization at issue and twenty months after the last securitization at issue, and more than a year before Ambac made any of the repurchase demands now in suit.

[2] By contract, Ambac's failure to pay insurance claims means that it is in default and cannot enforce any contract rights it might otherwise have. Declaration of Cameron S. Matheson, Ex. A, Pooling and Servicing Agreement, § 11.10. Moving to dismiss based on this defense would require reliance on evidence outside the Complaint and

*The Loans*

The loans at issue in this case were originated by Chevy Chase and deposited into six trusts in 2006 and 2007.  The loans in the trusts consisted primarily of conventional, adjustable-rate, first-lien residential mortgage loans.  If this case were to go to trial, Capital One would show that these loans, and hence the six trusts collectively, outperformed virtually all other comparable securitization transactions insured by Ambac.

*The Issues*

Prior to the global financial crisis and housing market crash, Ambac insured hundreds of deals involving residential mortgage-backed securities ("RMBS"), earning tens of millions of dollars in premiums.  Ambac assumed the risk that a severe downturn in the economy would cause significant delinquencies and defaults in the mortgage loans backing the RMBS it insured.  In the event such defaults caused a shortfall in cash flow through the trusts, Ambac would make up the shortfall in principal and interest payments due to investors.  Yet, now in the wake of the 2008 housing market crash, Ambac seeks to disavow its responsibility for the precise risk it assumed with respect to six RMBS securitization trusts sponsored by Chevy Chase Bank.  Ambac invokes the Court's equitable power to restore it to the position it would be in had it never issued the insurance policies.  Specifically, Ambac asks the Court to hold Capital One liable for all of Ambac's insurance "claims payments accrued to date and all claims payments required to be made in the future" for the six trusts.  Thus, Ambac seeks to shift all of its insurance payment obligations to Capital One even with respect to loans which it has acknowledged do not breach any warranties at all.  Notably, Ambac brings this action even

---

Capital One does not waive and specifically reserves its right to make such an argument in the future in the event the case is not dismissed.

though it has not paid any of its insurance obligations with respect to the six trusts at issue, and thus, it has not incurred any damages whatsoever.

Ambac alleges that Chevy Chase "persuaded" and "induced" Ambac into insuring the six RMBS deals by making representations and warranties about the loans that were false. Ambac claims that "had it known" that certain warranties were "false" it never would have issued the insurance policies in the first place. These fraud concepts have absolutely no factual basis and no bearing on this case. This is not a fraud case; rather it is a breach of contract case governed by the terms of the contracts involved.

The contracts at issue obligate Capital One to repurchase a loan that breaches a warranty, but only if the breach "materially and adversely" affects Ambac's interests. The contracts expressly provide that this constitutes the sole remedy for such a breach. If a loan's breach of warranty materially and adversely affected Ambac's interests, the loan was to be removed from the pool of loans collateralizing the bonds insured by Ambac. If the breach did not materially and adversely affect Ambac's interests, the loan remained in the pool of loans regardless of the fact that it might breach warranties. By contract, Ambac agreed to bear the risk of default on any loan that either does not breach a warranty or does not breach a warranty in a way that materially and adversely affects Ambac's interest.

Now, based on the allegation that 87% of a small sample of loans breaches Capital One's warranties, Ambac asks to be relieved of 100% of its insurance obligations. No basis exists for the Court to do so. Ambac's own Complaint demonstrates that Ambac's 87% figure is inflated to an absurd degree. The Complaint reveals that some 33% of the allegedly breaching loans were already paid in full when the loan file review was undertaken by Ambac. Factoring in the remaining 318 loans that Ambac acknowledges have no defects (13%), it turns

out, even under Ambac's inflated calculations, that 46% of the loans in the sample either do not breach a warranty or were paid in full.[3]  Yet Ambac would have the Court relieve it of 100% of its insurance obligations based on <u>alleged</u> defects in 54% of the loans.  In the event this case ever progressed to trial, Ambac would be unable to provide evidence to support its allegation of a 54% defect rate.

These facts taken from the Complaint reveal that Ambac's claims of Capital One's "pervasive breaches" and its "gutting of the bargain" are simply pretextual hyperbole. The truth of the matter is that Ambac, with the benefit of hindsight gleaned from the greatest economic disaster since the Great Depression, now sees its decision to insure the trusts as a mistake.  It wants this Court to relieve it from the consequences of this mistake by shifting the obligation to make insurance payments to Capital One without regard for the impact of the global economic crisis on mortgage default rates.  Such an unconscionable result is properly denied in equity.  In addition, Ambac's legal claims suffer from threshold defects that compel their dismissal as a matter of law.

First, Ambac's contract claims seek broad compensatory, consequential and rescissory damages for alleged breaches of representations and warranties.  Yet the parties expressly agreed that repurchase of loans was the "sole and exclusive" remedy available for breaches of the representations and warranties alleged here.  That agreement precludes the award of any other type of relief to Ambac.

Second, Ambac's attempt to enforce the repurchase remedy goes beyond what the contracts allow.  Ambac seeks the repurchase of <u>all</u> of the loans in the pools.  But Capital One is not obligated to repurchase any mortgage loan unless it has been given pre-suit notice of the

---

[3] Ambac reviewed 2,399 loans but demanded repurchase of only 1,286 of them.  Ambac's allegations of breaches are suspect given that 33% of the allegedly breaching loans were paid in full many years early.

breach with respect to that specific loan.  Capital One has only received such pre-suit notice with respect to 1,286 loans.  Accordingly, Ambac's claim that other loans must be repurchased is precluded by the terms of the agreements themselves.

Ambac's contract claims should be dismissed accordingly.

**STANDARD OF REVIEW**

Capital One moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Ambac's Complaint for failure to state a claim on which relief can be granted.  In considering this motion, the Court may look to the allegations of the Complaint as well as to documents incorporated by reference into, and/or integral to, the Complaint, such as the Pooling and Servicing Agreements and the Insurance and Indemnity Agreements.  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Exxon Mobil Corp. v. Tredegar Corp.*, No. 11-cv-2829 (MGC), 2012 WL 4027577, at *2 (S.D.N.Y. Sept. 13, 2012).

In order to survive the motion to dismiss, the Complaint must provide "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Exxon Mobil Corp.*, 2012 WL 4027577, at *2.  In applying this standard, the Court must accept the Complaint's well-pleaded factual allegations as true.  *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  The Court need not, however, accept legal conclusions or conclusory factual allegations as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555.  Likewise, the Court need not accept as correct the plaintiff's interpretation of contract language.  *Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 50 (2d Cir. 2010).  Indeed, "[w]here a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss."  *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012).

5

Here, the clear and unambiguous language of the Pooling and Servicing Agreements and the Insurance and Indemnity Agreements requires the dismissal of Ambac's claims because: (1) the Complaint impermissibly seeks remedies other than repurchase of loans; and (2) the Complaint seeks to force repurchase of loans for which no notice of breach has been provided to Capital One.

## STATEMENT OF FACTS

Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation ("Ambac") have sued Capital One for alleged defects in loans collateralizing the securities issued by six securitization Trusts.  Those Trusts are denominated in common as "Chevy Chase Funding LLC Mortgage-Backed Certificates" Trusts and distinguished by their series numbers: Series 2006-1, Series 2006-2, Series 2006-3, Series 2006-4, Series 2007-1 and Series 2007-2.  Ambac sues Capital One as the successor to the Chevy Chase entities nominally associated with the Trusts, and the names "Chevy Chase" and "Capital One" are used interchangeably in the Complaint and here.  Compl. ¶ 1 n.1.

The warranties which Ambac alleges were breached by Capital One appear in two types of contracts connected with each Trust, the Pooling and Servicing Agreements ("PSAs") and the Insurance and Indemnity Agreements ("I&Is").  Ambac alleges that the terms of these agreements are identical across all the trusts, and uses the documents in the 2007-1 Trust as the exemplars.  *Id.* ¶ 31 n.4; Ex. A (2007-1 Pooling and Servicing Agreement); Ex. B (2007-1 Insurance and Indemnity Agreement).[4]

---

[4] The designation "Ex." refers to the exhibits attached to the Declaration of Cameron S. Matheson, filed concurrently with this memorandum of law.

*The Pooling and Servicing Agreement*

The signatories to the PSA are Chevy Chase Funding, as the Depositor, Chevy Chase Bank, as the Seller and Servicer, and U.S. Bank, as the Trustee.  Section 11.10(a) provides that "[t]he Insurer is an express third-party beneficiary of this Agreement."

Section 2.04 of the PSA contains the "Representations, Warranties and Covenants of the Seller with Respect to the Mortgage Loans."  Section 2.04(a) contains the PSA warranties Ambac specifically identifies in the Complaint as having been breached:

> PSAs § 2.04(a)(xxxiv). "No fraud was committed by any Person (including, without limitation, [Chevy Chase], the related Mortgagor, the related appraiser or the related broker, if any) in connection with the origination and/or underwriting of any Mortgage Loan."

> PSAs § 2.04(a)(i). "The information set forth in the Mortgage Loan Schedule is complete, true and correct in all material respects, and all information provided to the Rating Agencies directly by [Chevy Chase], including the loan level detail, is true and correct in all material respects."

> PSAs § 2.04(a)(xxxvi). "Each Mortgage Loan is and will be a Mortgage Loan arising out of [Chevy Chase]'s practice in accordance with [Chevy Chase]'s underwriting guidelines in place at the time of its origination."

> PSAs § 2.04(a)(xxi). "The origination practices and the collection practices used by [Chevy Chase] with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business."

> PSAs § 2.04(a)(vii). "Any and all requirements of any federal, state or local law . . . applicable to the Mortgage Loan and the related Mortgaged Property have been complied with . . . .  Each Mortgage Loan, at the time it was made, complied in all material respects with all applicable predatory and abusive lending laws."

> PSAs § 2.04(a)(xvii). "[T]here is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and [Chevy Chase] has not waived any default, breach, violation or event of acceleration."

Compl. ¶ 31; *see also id.* ¶¶ 32, 46.

According to the Complaint, these warranties were breached by "loans made to borrowers (i) who do not qualify under the applicable underwriting guidelines or under prudent and proper origination practices; (ii) with unreasonable stated incomes or who otherwise have no reasonable ability to repay the loan; and/or (iii) who commit fraud by falsely representing their incomes, assets, liabilities, or intent to occupy their mortgaged properties." *Id.* ¶ 32. These alleged defects constitute the basis of all of Ambac's claims for breach of warranties. *Compare id.* ¶ 32, *with id.* ¶ 46. In short, every defect of which Ambac complains is covered by a warranty in § 2.04(a) of the PSA.

Section 2.04 also establishes the mechanism for remedying breaches of the warranties in § 2.04(a). It provides for the substitution of defective loans or the cure of defects in loan files and, if no substitution or cure is timely effected, the repurchase of the defective loans.[5]

Section 2.04(i) establishes this remedial protocol as the exclusive remedy for the breaches of § 2.04(a)'s warranties:

> It is understood and agreed that the obligation under this Agreement of the Seller or the Servicer to purchase or substitute any Mortgage Loan pursuant to Section[] . . . 2.04(b) shall constitute the sole and exclusive remedy respecting a breach of the . . . representations and warranties set forth in Section . . . 2.04 available to the Depositor, the Certificateholders, the Insurer or the Trustee on their behalf.[6]

---

[5] The possibility of cure expires 60 days from the date of notice of breach (§ 2.04(b)) and the possibility of substitution expired on March 15, 2009 (§ 2.04(c)). Since neither cure nor substitution is now available regarding the loans at issue, this memorandum will frequently refer to repurchase as the sole and exclusive remedy available to Ambac.

[6] Section 2.04(i) provides an additional remedy in the form of indemnification with respect to a breach of warranty contained in PSA, §§ 2.04(a)(vii), 2.04(a)(xxi), which Ambac has alleged here. This indemnification remedy does not alter the conclusion that repurchase is the only remedy available to Ambac under the circumstances of this case. *See* Argument, II(D)(2), *infra.*

### *The Insurance and Indemnity Agreement*

The signatories to the I&I are Ambac, as Insurer, Chevy Chase Bank, as Seller and Servicer, Chevy Chase Funding as Depositor, and U.S. Bank as Trustee.  Article II of the I&I contains the warranties and affirmative covenants issued by Chevy Chase Bank.  Ambac claims that these warranties "provided broader rights and remedies to Ambac."  Compl. ¶ 35.  The Complaint identifies three of these warranties as being relevant to the issues in this case:

> I&I Agreements § 2.01(j). "*Accuracy of Information.* Neither the Company Documents [the I&I, PSA, and Mortgage Loan Purchase Agreement] nor other information relating to the Mortgage Loans, the operations of Chevy Chase or the financial condition of Chevy Chase (collectively, the 'Chevy Chase Documents'), . . . furnished to [Ambac] by Chevy Chase contains any statement of a material fact which was untrue or misleading in any material respect when made. . . .  Since the furnishing of the Chevy Chase Documents, there has been no change nor any development or event involving a prospective change known to Chevy Chase that would render any of the Chevy Chase Documents untrue or misleading in any material respect."

> I&I Agreements § 2.01(g). "*Financial Statements.* The Financial Statements of Chevy Chase, copies of which have been furnished to [Ambac] (i) are . . . complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of Chevy Chase . . . and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied . . . .  Since the date of the most recent Financial Statements, there has been no Material Adverse Change in respect of Chevy Chase.  Except as disclosed in the Financial Statements, Chevy Chase is not subject to any contingent liabilities or commitments that . . . have a material possibility of causing a Material Adverse Change in respect of Chevy Chase."

> I&I Agreements § 2.01(k). "*Compliance with Securities Laws.* [T]he [Private Placement Memorandum] does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading . . . ."

*Id.* ¶ 36.

According to Ambac, these warranties specifically "attested" to the accuracy of:

> (i) the mortgage-loan "tapes," which were large spreadsheets that contained key attributes (*e.g.*, loan-to-value ratios, FICO or credit scores,

> and appraisal value and occupancy status . . .) and (ii) the Private
> Placement Memoranda, which were used to market the securities . . . to
> investors. . . .

*Id.* ¶ 37.  The Complaint further alleges that the Private Placement Memoranda were important to

Ambac, even though they were furnished for the investors' use, because those documents

assured Ambac that the loans were "originated generally in accordance with Chevy Chase's

underwriting guidelines," and "acted as a guarantee" that Chevy Chase had acted "prudently and

responsibly in originating the loans."  *Id.* ¶ 38.

   In actuality, however, the PSA had already warranted the accuracy of both

matters.  The mortgage loan tapes contained "the information required under . . .  the definition

of 'Mortgage Loan Schedule' in Article I of the Pooling and Servicing Agreement."  I&I, §

2.02(c)(iii).  Section 2.04(a)(i) of the PSA (quoted at Complaint ¶ 31) specifically warrants that

the "information set forth in the Mortgage Loan Schedule is complete, true and correct in all

material respects."  By the PSA's explicit definition, the Mortgage Loan Schedule contained all

the factual matters identified in the Complaint as critical to Ambac—the loan-to-value ratios, the

borrowers' credit scores, the appraisal values and the occupancy statuses regarding the loans.

PSA, Art. 1 at 34-35.

   Likewise, the PSA had already expressly warranted that Chevy Chase had

complied with its underwriting guidelines and that it had acted prudently and responsibly in

originating the loans.  Section 2.04(a)(xxxvi) of the PSA (quoted at Complaint ¶ 31) specifically

warrants that the loans were originated "in accordance with [Chevy Chase's] underwriting

guidelines."  Section 2.04(a)(xxi) of the PSA (quoted at Complaint ¶ 31) specifically warrants

that the loans were originated through practices that were "in all respects legal, proper, prudent

and customary in the mortgage origination and servicing business."

These PSA warranties were incorporated into and made a part of the I&I.  I&I, §§ 2.01(l), 2.02(k).  Both of these incorporating provisions identically reiterate that:

> the remedy for any breach of a representation and warranty of Chevy Chase in Section 2.04 of the Pooling and Servicing Agreement . . . shall be limited to the remedies specified in the Pooling and Servicing Agreement.

### The Allegedly Breaching Loans

Under the terms of the PSA, the repurchase remedy becomes available only after the Trustee has "promptly notif[ied]" Chevy Chase of the alleged breach and Chevy Chase has not cured the breach within 60 days of the notice.  PSA, § 2.04(b).  The "global relief" sought by Ambac concerns all of the 12,675 loans involved in the six securitizations.  Compl. ¶ 19.  Ambac claims it has "reviewed" 2,399 of these loans and "found" breaches of warranties in 2,081.  *Id.* ¶ 7.  Ambac concedes that, despite the alleged breaches, 795 of the reviewed loans fully performed and have been paid in full.  *Id.* ¶¶ 7, 48 n.12.   The Trustee, U.S. Bank, has given pre-suit notice of breach to Capital One with respect to alleged defects in the remaining 1,286 loans and no others.  *Id.*

## ARGUMENT

I.    REPURCHASE IS THE SOLE AND EXCLUSIVE REMEDY FOR THE BREACHES ALLEGED BY AMBAC.

As noted in the Statement of Facts, each alleged loan defect of which Ambac complains is expressly covered by a warranty contained in § 2.04(a) of the PSA.  *Compare* Compl. ¶ 32, *with* Compl. ¶ 46.

A.    *The parties agreed that repurchase would be the sole remedy for the breaches of warranties alleged by Ambac*.

Section 2.04(i) of the PSA and §§ 2.01(l), 2.02(k) of the I&I clearly and unambiguously provide that repurchase is the sole and exclusive remedy for breaches of the

warranties alleged by Ambac.  Accordingly, Ambac cannot pursue any remedy other than repurchase in this lawsuit.  *See, e.g.*, *Assured Guar. Mun. Corp. v. Flagstar Bank*, *FSB*, No. 11-cv-2375 (JSR), 2011 WL 5335566, at *4-5 (S.D.N.Y. Oct. 31, 2011) (granting motion to dismiss; permitting indemnification for insurer payments would render superfluous the more particularized sole remedy provisions establishing a repurchase protocol for defective mortgages); *MASTR Asset Backed Secs. Trust 2006-HE3, by U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012) (granting motion to dismiss; "the sole remedy available to U.S. Bank is to seek cure, repurchase or substitution of the allegedly defective WMC mortgages").[7]

> *Flagstar* is instructive here.  There, Flagstar entities, like the Chevy Chase entities here, acted as the sellers and depositors of mortgage loans into various securitization trusts to serve as collateral for certificates issued to investors.  2011 WL 5335566, at *1-2.  Assured, like Ambac here, insured those certificates.  *Id.* at *1.  Flagstar Bank issued warranties, to which Assured was a third party beneficiary, regarding the loans.  *Id.* at *1-2.  Both of the contracts providing those warranties provided that the sole and exclusive remedy for breaches of those warranties was the repurchase of the defective loan.  *Id.*  The Insurance and Indemnity agreements between Flagstar Bank and Assured incorporated those contracts and also provided that Flagstar Bank would indemnify Assured.  *Id.* at *3.  In addition, those I&Is empowered

---

[7] *See also In re Westmoreland Coal Co. v. Entech, Inc*., 100 N.Y.2d 352, 359 (2003) (reversing order directing that issue be submitted to alternative dispute resolution; "Westmoreland's interpretation of the [ADR] price adjustment provisions to provide a remedy for breach of a representation or warranty . . . would subvert this 'exclusive remedies' limitation [requiring a judicial resolution]."); *Lasker-Goldman Corp. v. City of New York*, 221 A.D.2d 153, 154 (1st Dep't 1995) (affirming grant of summary judgment dismissing claims for delay damages; "an extension of time to complete performance is the sole remedy for delay"); *cf. Bank of Am., N.A. v. Column Fin., Inc.*, No. 10-cv-6378, 2011 WL 2652464, at *4 (S.D.N.Y. July 6, 2011) (denying motion to amend complaint so as to add a claim against a defendant transferor of mortgage loans; defendant transferred loans "without recourse'' which limitation precluded liability consistent with "the remedial scheme . . . provid[ing] that Column's obligations to cure, repurchase or substitute are the 'sole remedies available to Depositor and its successors and assigns respecting any or Breach or Defect.'")

Assured to take whatever action in law or equity deemed appropriate to enforce Flagstar's obligations and provided that its remedies were to be cumulative unless otherwise indicated.  *Id.*

Like Ambac, Assured alleged that the vast majority of loans originated by Flagstar violated underwriting guidelines and were the result of fraud or negligence in the loan origination process.  *Id.* at *4.  Assured sought reimbursement of its insurance payments and indemnification pursuant to the terms of the I&I.  *Id.*

Flagstar moved to dismiss those claims on the ground that Assured had agreed to cure or repurchase remedy as the exclusive remedy for breaches of warranties.  The Court agreed.  *Id.* at *5 ("The SSAs and MPLAs *do* 'expressly provide [ ]' for Flagstar's 'cure or repurchase' obligation to be the exclusive remedy available to AGM for Flagstar's breach of a representation or warranty.") (emphasis in original).

The Court held that, contrary to the well-established rule of requiring contracts to be construed harmoniously as a whole, Assured's claim isolated the I&I's provisions from those of the other contracts.  *Id.* (citing *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002)); *see also Liberty USA Corp. v. Buyer*'*s Choice Ins. Agency LLC*, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005) (granting motion to dismiss based on interpretation of forum selection clause; "In New York, it is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together.").  Accordingly, the Court dismissed Assured's indemnity claims on the ground that Assured's sole and exclusive remedy for the alleged breaches was cure or repurchase.  2011 WL 5335566, at *5.

The same principles govern here.  The PSA provides that the sole and exclusive remedies for breaches of the warranties contained in § 2.04(a) are cure or repurchase.  PSA, § 2.04(b).  All of the breaches alleged by Ambac constitute breaches of the warranties contained in

§ 2.04(a) of the PSA.  *Compare* Compl. ¶ 32, *with* Compl.  ¶ 46.  The I&I not only incorporates

the PSA, it twice emphasizes and reiterates that the sole and exclusive remedies for breaches of

the warranties contained in § 2.04(a) are cure or repurchase.  I&I, §§ 2.01(l), 2.02(k).   Ambac's

claims for any other remedies should, therefore, be dismissed.

> B.    *Ambac's distinction between "Loan Level" and "Transaction Level" warranties is meaningless and irrelevant*.

In order to end-run the sole and exclusive remedy provisions of both the PSA and

the I&I, Ambac invents the notion that the contracts contain different "levels" of warranties—

"Loan Level" warranties in the PSA which are admittedly governed by the exclusive remedy

provisions, and "Transaction Level" warranties in the I&I which Ambac claims are not so

limited.  *Id.* ¶¶ 35-43.  Indeed, this notion is so central to Ambac's case that fully 50% of the

substantive allegations of the Complaint (26 out of 52) refer to and depend on the "Loan Level"-

"Transaction Level" distinction.[8]  Ambac's wholly fictional construct creating two "Levels" of

warranties finds no support in the PSA or I&I.  Furthermore, this invented distinction ignores the

I&I's express incorporation of the warranties and exclusive remedy provision of the PSA.  This

fact alone destroys Ambac's allegations that the PSA and I&I provide different "Levels" of

warranties.  By virtue of that incorporation, the I&I necessarily contains the very same "levels"

of warranties and remedy limitations as the PSA.

In any event, Ambac's contrived concepts of differing "levels of warranties" and

its *ad hoc* labels are irrelevant.  The warranties in the PSA and the I&I apply to the same pools of

loans in the same way within the context of the same securitization.  As warranties, they do not

differ in kind or quality.  The question presented here is simply what remedy is available for the

loan defects alleged by Ambac.  Since the only loan defects alleged by Ambac are specifically

---

[8] This calculation excludes the paragraphs concerning the parties, the Court's jurisdiction, and the counts setting forth the causes of action.

governed by the repurchase provisions of the PSA and the I&I, Ambac's only remedy is repurchase of the loan.

> 1. *Ambac's interpretation is contradicted by the I&I itself.*

Ambac claims that it is entitled to "broader" remedies than repurchase based on § 5.02 of the I&I.  Compl. ¶¶ 35, 40-42.   But that section actually precludes the alternative remedies Ambac seeks:

> (a) Upon the occurrence of an Event of Default, the Insurer may take whatever action at law or equity as may appear necessary or desirable in its judgment to *collect the amounts*, if any, then due under this Insurance Agreement or the Pooling and Servicing Agreement or *to enforce the performance and observance of any obligation, agreement or covenant* of Chevy Chase under this Insurance Agreement or the Pooling and Servicing Agreement.

> (b) *Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive* of any other remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement, the Pooling and Servicing Agreement or existing at law or in equity.

(Emphasis added.)

By virtue of § 5.02(b), whatever general rights are granted to Ambac under § 5.02(a) exist <u>only</u> when a remedy is not stipulated to be exclusive.  The I&I establishes that repurchase is the exclusive remedy for breaches of warranties covered by the PSA.  I&I, §§ 2.01(l), 2.02(k).  As demonstrated, the loan defects pleaded by Ambac are entirely covered by the warranties in the PSA.  Thus, rather than showing that Ambac is entitled to other remedies here, § 5.02 verifies that repurchase is Ambac's only remedy.[9]

---

[9] Accordingly, § 5.02(a) merely authorizes Ambac to enforce the repurchase remedy itself by "whatever action at law or equity as may appear necessary."  It does not afford an alternative to the remedy of repurchase.

2. *Ambac's distinction based on supposed warranty "levels" lacks factual and textual support.*

Ambac would have the Court believe that the warranties connected with the transfer to the trustee of pools of thousands of loans for the purpose of securitization operate on a different "level" than warranties connected with the insurance of those same pools of loans for purposes of the same securitization. Given that the warranties in both situations (1) are made in single documents; (2) cover the same pools of thousands of loans in bulk; (3) and are made for the purpose of the same securitization, they manifestly operate on the same "level." Ambac provides <u>no</u> factual support for its conclusory allegations that the "Loan Level"-"Transaction Level" distinction exists in the first instance. Compl. ¶¶ 35, 42.

Likewise, no textual support exists for Ambac's distinction based on "levels." The language used in either purported "level" of warranty is indistinguishable from the other. For example, Ambac contends that the following constitutes a "Loan Level" warranty:

> [e]ach Mortgage Loan is and will be a Mortgage Loan arising out of [Chevy Chase]'s practice in accordance with [Chevy Chase]'s underwriting guidelines in place at the time of its origination . . . .

*Id.* ¶ 31 [quoting PSA, § 2.04(a)(xxxvi)]. But, inexplicably, Ambac also contends that that the following substantively identical provision constitutes a "Transaction Level" warranty:

> The Mortgage Pool consists entirely of Mortgage Loans originated or acquired by Chevy Chase . . . . The Mortgage Loans were originated generally in accordance with Chevy Chase's underwriting guidelines for the Program. Each Mortgage Loan originated or acquired by Chevy Chase in connection with the Program is classified as belonging to a particular type . . . .

*Id.* ¶ 38 [quoting the Private Placement Mem. at 26]. In fact, the language of the PSA warranty is indistinguishable from that of the I&I warranty.

As this example illustrates: (1) the PSA and the I&I do not warrant matters on different "levels"; and (2) the warranties in the I&I are no more intrinsically "pool wide" or "transaction related" than those in the PSA. As a factual and textual matter, Ambac's distinction is unjustified and nothing more than a contrivance designed to avoid the sole and exclusive remedy of repurchase mandated by the PSA and the I&I.

3. *Ambac's distinction based on supposed warranty "levels" violates the rules of contract interpretation.*

The contrived "Loan Level"-"Transaction Level" distinction advocated by Ambac also violates fundamental rules of contract interpretation. The Complaint establishes that the specific loan defects alleged by Ambac are necessarily covered by the warranties contained in § 2.04(a) of the PSA. *Compare* Compl. ¶ 32, *with* Compl. ¶ 46. Even Ambac recognizes that the PSA establishes repurchase as the sole and exclusive remedy for breaches of warranties in the PSA. *Id.* ¶¶ 33, 40. In order to circumvent this remedy, Ambac hypothesizes that the I&I redundantly warranted the very same matters as the PSA, but afforded Ambac "broader rights and remedies" for the breaches of those redundant I&I warranties. *Id.* ¶¶ 35, 36, 46. This reading violates fundamental rules of contract construction.

First, Ambac's interpretation violates the principle that contract language will not be interpreted so as to render language meaningless or superfluous. *Verzani*, 641 F. Supp. 2d at 299 (granting motion to dismiss in part). Here, the parties agreed three times, once in the PSA and twice in the I&I, that breaches of the warranties contained in § 2.04(a) of the PSA could be remedied only by cure or repurchase. PSA, § 2.04(b); I&I, §§ 2.01(l), 2.02(k). That agreed limitation is rendered meaningless if Ambac can simply claim that the warranty breached was a "Transaction Level" warranty exempt from the exclusive remedy limitation notwithstanding that the warranty is identical to a PSA warranty.

17

Second, Ambac's interpretation violates the rule that the meaning of specific provisions controls the meaning of general provisions. *See DBT Gmbh v. J.L. Mining Co.*, 544 F. Supp. 2d 364, 377-78 (S.D.N.Y. 2008) (granting summary judgment dismissing claim that would have circumvented remedy limitations). For example, the PSA specifically warrants that the information contained in the PSA's warranty of the Mortgage Loan Schedule information is "complete, true and accurate in all material respects . . . ." (Compl. ¶ 31[quoting PSA, § 2.04(a)(i)]). That warranty entirely and explicitly covers the information contained in the mortgage loan tapes.[10] Nonetheless, Ambac claims that the tapes' accuracy was separately warranted in the I&I under a warranty regarding "other information." I&I, § 2.01(j); Compl. ¶¶ 36-37. Since the information contained in the mortgage loan tapes was specifically warranted in the PSA and specifically subjected to the exclusive remedy provision, Ambac's attempt to seek other remedies based on the I&I's general warranty of "other information" must be rejected.

II.     AMBAC'S CLAIMS ARE DEFECTIVE AS A MATTER OF LAW AND
        SHOULD BE DISMISSED.

Ambac alleges five causes of action against Capital One. Each cause of action is defective in whole or in part.

A.     *Ambac failed to give notice of defects to Capital One for most of the loans at issue and its first cause of action should be dismissed in substantial part.*

Ambac's first cause of action alleges breaches of warranties covered by § 2.04(a) of the PSA. Compl. ¶ 63. Ambac concedes that cure or repurchase constitutes the sole and exclusive remedy for breaches of those warranties. *Id.* ¶¶ 33, 40. Pursuant to PSA § 2.04(b) that

---

[10] The I&I specifically establishes that the "mortgage loan tapes" contained "the information required under . . . the definition of 'Mortgage Loan Schedule' in Article I of the Pooling and Servicing Agreement." I&I,§ 2.02(c)(iii). The Complaint conclusively corroborates this fact. *Compare* Compl., ¶ 37 (identifying the information in the tapes at issue), *with* PSA, Article 1(identifying the same information as components of the warranted Mortgage Loan Schedule).

remedy is available only with respect to allegedly defective loans for which prompt notice was given:

> Upon the discovery . . . of a breach or breaches of any of the representations and warranties made in Section 2.04(a) in respect of any Mortgage Loan . . . which breach or breaches, individually or in the aggregate, materially and adversely affect the interests of the Depositor, the Certificateholders or the Insurer . . . . [t]he Trustee *shall promptly notify* the Seller . . . of any such breach and request that the Seller . . . cure such breach within 60 days from the date of such notice, *and if the Seller . . . does not cure* such breach in all material respects, the Seller . . . shall purchase such Mortgage Loan . . . from the Trustee . . . .

(Emphasis added.)

Before filing suit, the Trustee notified Capital One of alleged breaches in only 1,286 of the 12,675 loans involved in the six securitization trusts. Contrary to the express terms of PSA, § 2.04(b), however, Ambac asks the Court to compel Capital One to repurchase "each of the loans that breach its Loan-Level Warranties." Compl., "Prayer for Relief," ¶ A. Ambac's claims for relief must be limited to the 1,286 loans for which notice was given to Capital One. *MASTR*, 843 F. Supp. 2d at 1000 (dismissing trustee's claims arising out of allegedly defective mortgage loans).

The court's analysis in *MASTR* is particularly persuasive here given that the contract language in that case cannot be distinguished from the language of the PSA. There, as here, the contract required the originator to "either cure or repurchase defective loans within 60 days of being notified of the breach." *Id*.[11] The plaintiff trustee in *MASTR*, U.S. Bank, had

---

[11] As quoted by the defendant in its memorandum in support of its motion to dismiss, the contract provided:

> Upon discovery by either the Company or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser (or which materially and adversely affects the value of a Loan or the interests of the Purchaser in a related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), the party discovering such breach shall give prompt written notice to the other parties.

requested that the defendant originators, WMC and EquiFirst, repurchase 150 allegedly defective loans identified in a sampling of 200 loans.  The originators refused.

U.S. Bank then sued, asking the Court to order the originators to repurchase <u>all</u> of the mortgages they had sold to the trust or otherwise reimburse the trust "for the bad mortgages." *Id.* at 997.  The Court refused this request and dismissed U.S. Bank's claims arising out of any loans other than those for which notice had been given: "U.S. Bank's claims arising out of other loans, for which it has yet to give WMC and EquiFirst notice and an opportunity to cure, are not yet ripe. Those claims must be dismissed." *Id.* at 1000.[12]

To similar effect is *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, No. 5140-CS, 2012 WL 3201139, at *2-3 (Del. Ch. Aug. 7, 2012).  There, the court dismissed as time-barred new claims asserted by the plaintiff regarding loans that were not put at issue in the original complaint.  The court reasoned that the original complaint did not put the defendant on notice of the plaintiff's new claims

> *especially in light of the specific notice and cure regime prescribed by the Master Agreement* that requires Central Mortgage to give Morgan Stanley "prompt written notice" of its alleged breaches. Central Mortgage would end run this clear contractual loan-by-loan requirement and our state's statute of limitations by its argument in support of relation back.

*Id*. at *3 (emphasis added).

---

Within 60 days of the earlier of either discovery by or notice to the Company of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans, the Company shall use its commercially reasonable efforts promptly to cure such breach in all material respects and if such breach cannot be cured, the Company shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price.

*MASTR*, No. 11-cv-2542, ECF No. 27, "Defendant WMC's Mem. in Support of Its Mot. to Dismiss," at 8.

[12] *See also Kel-Tech Const., Inc. v. N.Y.C. Hous. Auth*., 79 A.D. 3d 607 (1st Dep't 2010) (affirming dismissal of plaintiff's claims due to plaintiff's failure to comply with the contractual condition precedent to suit); *ALJ Capital I, L.P. v. David J. Joseph Co*., 2007 N.Y. Slip. Op. 50867(U) at *4-6 (Sup. Ct. N.Y. County Mar. 13, 2007) (finding that plaintiff could not seek repayment under the operative contract because the plaintiff failed to provide prompt written notice, a condition precedent for seeking recovery for breach of the contract).

Likewise, Ambac's claims arising out of any loans other than the 1,286 loans for which notice has been given[13] to Capital One must be dismissed.

> **B.** _Ambac's second cause of action for breach of the repurchase protocol should be dismissed._

Ambac's second count alleges a breach of the repurchase protocol. This count fails to state a cause of action because repurchase is a remedy for a breach, not an obligation that can be separately breached.

No reason exists to sue for a breach of warranty materially and adversely affecting Ambac's rights unless repurchase is refused in the first instance. If a loan materially and adversely breaches a warranty, then repurchase is the only available remedy that can be ordered by the Court. If the loan does not materially and adversely breach a warranty, then repurchase is not required. In either case, the salient question is whether a given loan materially and adversely breached a warranty. Allowing a suit for breach of the repurchase protocol would condone a bootstrapping mechanism transparently designed to avoid the sole and exclusive remedy of repurchase itself. Ambac's theory is not only too clever by half, it is again precluded by the words of the contracts at issue here.

Both the PSA and the I&I expressly and repeatedly describe repurchase as a "remedy." PSA, § 2.04(b); I&I, §§ 2.01(l), 2.02(k). By describing repurchase as a "remedy" for a breach, the parties indicated their plain intent that repurchase was not a separate obligation that could itself give rise to a separate breach.

Indeed, if a refusal to repurchase gave rise to a separate and additional cause of action, then Capital One would always be forced to accept Ambac's determination that a loan

---

[13] Capital One does not concede that the notice provided with respect to the 1,286 loans was either timely or that the form of notice was adequate.

breached a warranty or risk *automatically turning one breach into two* simply because it believes that no breach exists.  The contract cannot be read to justify such a nonsensical result.  *Citibank, N.A. v. United Subcontractors, Inc.*, 581 F. Supp. 2d 640, 644 (S.D.N.Y. 2008) (granting plaintiff's motion for summary judgment on contract claim; "[w]hen interpreting a contract, the court should give fair meaning to the language employed and reach 'a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized.'" (citation for quotation omitted)); *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc*., 84 N.Y.2d 430, 438 (1994) (affirming remittitur of jury's damages award based on the principles that courts avoid contract interpretations which give one party an unfair and unreasonable advantage over the other and that language placing one party at the mercy of another is not favored).  The second cause of action should be dismissed.

      C.  *Ambac's third cause of action for material breach of the I&I should be dismissed.*

      1.  *The cause of action is precluded by the exclusive remedy of repurchase.*

      In its third cause of action, Ambac claims a material breach of the I&I and requests "global relief" and "broad remedies" based on its "Loan Level"-"Transaction Level" distinction.  Compl. ¶¶ 34-43, 58, 69, 71.  As demonstrated in Argument I, however, the sole and exclusive remedy for the alleged breach of the PSA warranties at issue in this case is repurchase of the offending loan.  The third cause of action is precluded by the exclusive remedy provision and duplicative of the first cause of action for repurchase.  In either case it should be dismissed.

      2.  *Rescissionary remedies are barred.*

      Ambac expressly asks to be "returned to the position [Ambac] would be in had Ambac not issued its Policies."  *Id.* ¶ 58.  By asking to be returned to its pre-contract position, Ambac seeks, by definition, either rescission or a rescission-like remedy.  The request is, of

course, ironic given that Ambac has failed to pay any of the insurance claims submitted by the Trustee for the trusts at issue.

The effect of rescission "is 'to declare the contract void from its inception and to put or restore the parties to *status quo*.'" *Symphony Space, Inc. v. Pergola Props., Inc*., 214 A.D.2d 66, 80 (1st Dep't 1995) (affirming dismissal of counterclaim for rescission; citation of quoting authority omitted), *aff'd*, 88 N.Y.2d 466 (1996). Here, however, the Policies cannot be declared void. Ambac alleges that its Policies were issued irrevocably for the benefit of third-party investors. Compl. ¶¶ 8, 25. Presumably, then, Ambac seeks so-called "rescissory damages" as an indirect form of rescission—damages sufficient to constitute the economic equivalent of an actual rescission. *E.g., Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc*., 2012 N.Y. Slip Op. 52001(U) at *6-7 (Oct. 11, 2012) ("*DLJ*"). Both rescission and rescissory damages are variations of the same fundamental type of equitable relief. *Assured Guar. Mun. Corp. v. UBS Real Estate Secs. Inc*., No. 12-cv-1579, 2012 WL 5927379, at *3 (S.D.N.Y. Nov. 21, 2012) ("*UBS*").

### a. By accepting premiums, Ambac has waived any right to rescind.

Rescissionary remedies are subject to the requirement that the plaintiff file suit seeking such remedies promptly after its right to rescind accrued. *Id.* at *3. Furthermore, under New York law, a party cannot treat a contract as subsisting and still seek to rescind it. *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999). This latter rule has a specialized application in the context of insurance. "It is black letter law" that an insurer's acceptance of premiums after acquiring knowledge of facts permitting avoidance of the policy precludes the insurer from later avoiding the policy on that basis. *DLJ*, 2012 N.Y. Slip

Op. 52001(U) at *5.  These principles preclude the award of any type of rescissionary relief to Ambac.

Ambac alleges that it is subject to the authority of a court-appointed Rehabilitator, and references the March 24, 2010 orders of the Circuit Court for Dane County Wisconsin establishing that authority.  Compl. ¶¶ 10-12.  Among the orders entered by the Wisconsin court that day was an "Order for Temporary Injunctive Relief."  Ex. C.  By that Order, the Wisconsin court enjoined and restrained all parties and entities "from withholding or failing to pay or setting off premiums" owed to the Segregated Account on policies issued by Ambac under penalty of disallowance or decrease in the payments on those policies.  *Id.* at ¶ 7; *cf.* Compl. ¶ 12 ("Ambac . . . retains the right to receive any cash recoveries relating to the policies.").  The Court may reasonably infer that Ambac has accepted those premiums.

Accordingly, rescissionary relief cannot be awarded here.  *See DLJ*, 2012 N.Y. Slip Op. 52001(U) at *9.  The plaintiff insurer in *DLJ* (Assured), like Ambac, had issued financial guaranty policies insuring investors holding certificates issued by a mortgage-backed securitization trust.  Like Ambac, Assured sued for breaches of warranties in Pooling and Servicing Agreements regarding the loans.  One of the insurer's causes of action sought rescissory (rescissionary) damages.  Because the insurer had accepted premiums after gaining knowledge of the alleged breaches, the court dismissed that cause of action.

> As a result of their acceptance of premiums after their knowledge of the alleged breach, Plaintiffs are estopped from rescinding the Policies and from obtaining the equivalent of rescission in the form of rescissory damages.

*Id.* at *6.  Likewise, Ambac is precluded here from seeking or obtaining any form of rescission-based relief.

b.   A rescissionary remedy is barred by the inequitable result Ambac seeks.

According to Ambac, an overarching concern of the parties was to allocate

properly the risks connected with Ambac's issuance of financial guaranty insurance:

> Capital One assumed the risk that the Loan-Level Warranties were false,
> Ambac assumed the risk that the loans bearing the attributes that Capital
> One represented and warranted might not perform as expected after the
> closing of the Transactions.

Compl. ¶ 3; *see also id.* ¶¶ 27-29, 30, 39.  The Complaint further alleges that some 33% of the

loans reviewed by Ambac performed properly and were fully paid off despite alleged

"pervasive" breaches of warranties.  *Id.* ¶¶ 7, 48 n.12.  Plainly, no inherent correlation exists

between an alleged breach of warranty and an insurance payment for default.  Furthermore, the

Complaint establishes that, even using Ambac's grossly inflated numbers, at least an additional

13% of the loans reviewed did not breach any warranties in the first instance.  *Id.* ¶¶ 7, 48 n.12.

Thus, about half of the loans in the sample either do not breach a warranty or do not present a

danger of default because they have been paid in full.

Based on the facts evident on the face of the Complaint, Ambac asks the Court to

relieve it of 100% of its liability based on defects affecting about half of the loans.  Under the

circumstances, the grant of the rescissionary relief requested by Ambac would be manifestly

inequitable, destroying the "risk-allocation that these sophisticated parties negotiated" (*Id.* ¶ 30)

and constituting an undeserved windfall to Ambac.  This fact precludes the relief sought by

Ambac.

"[I]t is well-established that a litigant who seeks equity must do equity."  *In re*

*U.S. Lines, Inc.*, 318 F.3d 432, 437 (2d Cir. 2003).  For that reason, courts properly refuse relief

to plaintiffs in equity who ask for inequitable or unconscionable results.  *M & T Mortg. Corp. v.*

*Foy*, 20 Misc. 3d 274, 278-79 (Sup. Ct. N.Y. County 2008) (*citing Monaghan v. May*, 242 A.D.

64 (2d Dep't 1934)).  Here, by asking to be released from its own voluntarily undertaken risk Ambac seeks just that—an inequitable result.  Ambac's request for rescissionary relief should be denied.

> ### D.  *Ambac's fourth cause of action for indemnification should be dismissed.*

Ambac's fourth cause of action for indemnification is defective and should be dismissed for the following three independent reasons.

> #### 1.  *Indemnification is precluded by the terms of the I&I.*

In order to be awarded indemnity under an indemnity provision, a party must show that the parties specifically intended to allow indemnity for the specific claim at issue. *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 415 (S.D.N.Y. 2011) (dismissing claim for contractual indemnity).  The language of an indemnity contract must be strictly construed and must express an "unmistakable intention" to indemnify against the particular claim.  *Heimbach v. Metro. Transp. Auth.*, 75 N.Y.2d 387, 392 (1990).  The language of the I&I not only fails to express an unmistakable intent that Ambac recover under these circumstances, it affirmatively precludes the possibility of indemnity.

> ##### a.  The I&I expressly precludes indemnification here.

Ambac rests its claim for indemnity on I&I, § 3.04(a).  Compl. ¶ 74.  Section 3.04(a)(iv), however, expressly excludes the breaches alleged by Ambac from the scope of the alleged indemnification obligation.  The indemnity obligation is triggered "by reason of":

> the breach by Chevy Chase of any representation, warranty *(other than any representation or warranty in respect of the Mortgage Loans under Section 2.04(a) of the Pooling and Servicing Agreement)*. . . .

(Emphasis added.)  Since all of the loan defects of which Ambac complains are covered by the warranties of § 2.04(a) of the PSA, it is impossible for an obligation to indemnify to have been triggered in the first instance.

      b.  <u>The exclusive remedy provisions preclude indemnification</u>.

As demonstrated above, repurchase is Ambac's sole and exclusive remedy for the loan defects alleged in the Complaint.  Courts have held that this exclusive remedy precludes this attempt to obtain money damages under the ruse of a claim for indemnification.

In *Flagstar*, the Court found that the insurer's

> expansive interpretation of the Transaction Documents' indemnification provisions would be irreconcilably inconsistent with, and therefore render superfluous, the more-particularized "sole remedy" provisions discussed above.

2011 WL 5335566, at *4-5.  Similarly, the court in *MASTR* found that the sole and exclusive remedy of repurchase precluded any attempt to recover, as Ambac does in this count, money damages:

> under the clear terms of the parties' agreement, the sole remedy available to U.S. Bank is to seek cure, repurchase or substitution of the allegedly defective WMC mortgages. US Bank may not recover additional remedies, including monetary damages, from WMC, and U.S. Bank's claim for damages is dismissed.

843 F. Supp. 2d at 1001.[14]

---

[14] Courts applying New York law have rejected similar attempts to expand indemnification clauses to include actions on otherwise barred claims for breaches of an underlying contract.  For example, in *Red Sea Tanker Fund Ltd. v. Chase Manhattan Bank, N.A.*, the Second Circuit explained that an "indemnification clause may not be used to recover damages suffered by [plaintiffs] as a direct result of the alleged breach, because any such recovery would effectively circumvent the statute of limitations on breach of contract claims." No. 99-7282, 1999 WL 973503, at *2 (2d Cir. Oct. 6, 1999); *cf. Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1194 n.2 (W.D. Wash. 2011) (granting summary judgment dismissing claims as time-barred; "New York courts have rejected similar attempts by plaintiffs to improperly circumvent statutes of limitations by simply recasting their claims as ones for indemnity.")

> 2. *The count seeking indemnity will not lie because there is no underlying third-party action against Ambac.*

Under New York law, an indemnity clause typically does not cover claims arising between the parties themselves—for breach of warranty, for example—but presumptively covers only claims asserted by third parties against the indemnified party. *BNP Paribas Mortg. Corp.*, 778 F. Supp. 2d at 415 ("[u]nless the indemnification clause refers 'exclusively or unequivocally' to claims between the indemnitor and indemnitee, the court 'must find the agreement to be lacking evidence of the required intent' to cover such claims") (citation for quotation omitted); *accord Goshawk Dedicated Ltd. v. Bank of N.Y.*, No. 06-cv-13758, 2010 WL 1029547, at *7 (S.D.N.Y. Mar. 15, 2010) (denying motion for summary judgment that interparty indemnity was owed); *Sequa Corp. v. Gelmin*, 851 F. Supp. 106, 110 (S.D.N.Y. 1994) (dismissing interparty indemnity claim); *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989) (reversing grant of summary judgment awarding interparty indemnification); *Gotham Partners, L.P. v. High River Ltd. P'ship*, 76 A.D.3d 203, 207-08 (1st Dep't 2010) (same).

In light of this well-established principle, the Court's decision in *Flagstar* is again instructive.  The Court dismissed an insurer's claim for indemnity under circumstances analytically indistinguishable from those here:

> the Court concludes that the indemnity provisions of the I&Is and SSAs relate solely to claims brought by third-parties against [the insurer, Assured], not claims, such as those asserted here, that [Assured] commences on its own behalf.

*Flagstar*, 2011 WL 5335566, at *5.  The *Flagstar* Court supported its conclusion (in part) with language from the I&I at issue in that case:

> § 3.04(b) clarifies that Flagstar's indemnification obligations only apply with regard to "action[s] or proceeding[s] (including any governmental investigation) [that are] brought or asserted against [AGM]" by a third- the

> PSA and the I&I do not: indemnity may be sought ... [AGM] shall promptly notify [Flagstar] in writing").

*Id.*  This same language appears in § 3.04(c) of the I&I here:

> If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person . . . in respect of which the indemnity provided in Section 3.04(a) or (b) may be sought from Chevy Chase . . . each such Indemnified Party shall promptly notify the Indemnifying Party in writing . . . .

Accordingly, Ambac's claims for indemnity should be dismissed inasmuch as its claims are not based on actions brought by third parties against Ambac, but depend entirely on the interparty relationship of Ambac and Chevy Chase.

### E.  *Ambac's fifth cause of action for reimbursement should be dismissed.*

As previously demonstrated, the sole and exclusive remedy for the alleged breach of the PSA warranties at issue in this case is repurchase of the loan.  Indeed, the compensation Ambac seeks in reimbursement will necessarily be supplied if it succeeds in forcing the repurchase of any loans.  Consequently, Ambac cannot be allowed to reap a double recovery by being awarded both a repurchase remedy and reimbursement.  The claim for reimbursement should, therefore, be dismissed.

29

## CONCLUSION

For the foregoing reasons, Capital One respectfully requests that the Complaint be dismissed with prejudice to the extent that: (1) it seeks any remedy other than repurchase; and (2) it seeks any remedy at all for any loan other than the 1,286 loans for which Capital One has been given notice of defects.

Respectfully submitted,

/s/ Cameron S. Matheson
Cameron S. Matheson

James A. Murphy
Murphy & McGonigle, PC
4870 Sadler Road, Suite 301
Glen Allen, Virginia 23060
(804) 762-5320

James K. Goldfarb
Soren E. Packer
Murphy & McGonigle, PC
60 East 42nd Street, Suite 5230
New York, New York 10165
(212) 880-3961

*Attorneys for Defendant Capital One, N.A.*