D37namba                    Argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

AMBAC ASSURANCE CORPORATION,
et al.,

                    Plaintiffs,

            v.                          12 Civ. 7937 (MGC)

CAPITAL ONE, N.A.,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        March 7, 2013
                                        10:30 a.m.

Before:

                HON. MIRIAM GOLDMAN CEDARBAUM,

                                        District Judge

                        APPEARANCES

PATTERSON BELKNAP WEBB & TYLER LLP
        Attorneys for Plaintiffs
BY:  PETER W. TOMLINSON
        HENRY J. RICARDO
        BENJAMIN LITMAN


FOLEY & LARDNER LLP
        Attorneys for Plaintiff Segregated Account
BY:  JEFFREY SIMMONS

MURPHY & MCGONIGLE PC
        Attorneys for Defendant
BY:  JAMES A. MURPHY
        JAMES K. GOLDFARB

D37namba                      Argument

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  This is a motion to dismiss a complaint.

2          Why don't I hear first from the proponent of the

3     motion.

4          MR. MURPHY:  Thank you, your Honor.

5          Good morning.  My name is James Murphy.  I represent

6     Capital One.  This is my first appearance before the Court on

7     this matter.

8          We have brought a motion to dismiss.  We worked very

9     hard to try to refine the issues, and I think there are really

10    two issues for the Court to decide with respect to our motion.

11    Before I address those issues, if I could just set the stage a

12    little bit.  I represent Capital One.

13         THE COURT:  Capital One is located in northern

14    Virginia?

15         MR. MURPHY:  It is.  It is right on the Beltway.  Its

16    corporate headquarters is in McLean, Virginia.

17         Capital One acquired Chevy Chase Bank in 2009.  Chevy

18    Chase Bank originated loans and put together six securitization

19    trusts in the 2006 and 2007 time period and AMBAC, the

20    plaintiff in this case, insured portions of those deals.

21         THE COURT:  Right.  This was not a typical banking

22    transaction clearly.  That was a sale of securities, isn't that

23    right?

24         MR. MURPHY:  Securitizations are very, very common.

25    So I am not sure what --

4

D37namba                          Argument

1          THE COURT:  I understand they are common.  But they

2    are not banking functions really, but that is a separate issue.

3          MR. MURPHY:  Well, a lot of banks achieve --

4          THE COURT:  For the last ten years everybody has wants

5    to sell securities and everybody wants to back them with

6    mortgages.

7          MR. MURPHY:  Your Honor, that is exactly why I wanted

8    to set a little bit of the background here.  I fully understand

9    that on our motion to dismiss we must accept all of the

10   well-pleaded factual allegations as true for purposes of the

11   motion, but just simply by way of background Chevy Chase Bank

12   in some form or another has been around since 1892, when it was

13   founded.

14         THE COURT:  Right.  As a bank.

15         MR. MURPHY:  It was a bank, and mortgage was a big

16   part of what it did.

17         THE COURT:  I understand.

18         MR. MURPHY:  The reason I bring that up is simply

19   because there is a lot of publicity and press about cases

20   involving companies that I consider to be very different from

21   Chevy Chase Bank, which is a bank.

22         THE COURT:  I understand.  But not very different

23   transactions if they are mortgage-backed securities.  I can't

24   tell you how many I have had in the last few years for

25   securities fraud.

1          MR. MURPHY:  The transactions were very simple.  The

2    difference is this is a bank with underwriters who work at the

3    bank, and these underwriters underwrite loans.  Some of them

4    were held on the balance sheet, some of them go into

5    securitization trusts.

6          It is a little bit different from other companies that

7    I won't name that have a very different business model, banks

8    with branches, and underwriters who are trained underwriters by

9    the bank underwrite loans that are held by the bank as well as

10   loans that go into securitizations.  So I simply wanted to

11   point out that this may very well be a very different category

12   and may explain why these loans --

13         THE COURT:  But this is a suit for breach of contract.

14         MR. MURPHY:  Right.

15         It may explain why these loans performed very well

16   through the financial crisis.

17         So I said there were two issues on our motion to

18   dismiss.  The first issue is, is the repurchase remedy the sole

19   remedy for the claims alleged in this case.  That is issue

20   number one.

21         Issue number two is, what is the universe of loans

22   that will be at issue in this case.  Is it the loans for which

23   AMBAC has given notice to Capital One, which are 1286 loans, or

24   is it the full universe of all of the loans in these deals, for

25   which no notice has been given?

D37namba                          Argument

1              THE COURT:  All of that depends on the language of the

2      contract.

3              MR. MURPHY:  Exactly.  Precisely.

4              So that is why courts have found that it is

5      appropriate to address these two issues on a motion to dismiss.

6      There aren't extraneous factual issues that will impact the

7      answers to these two issues.

8              THE COURT:  Provided the contracts are unambiguous.

9              Isn't that right?

10             MR. MURPHY:  Exactly.  That is absolutely right.  And

11     these are long and sometimes complicated contracts for sure.

12             So I will address the first issue first.  There are

13     two contracts.  One is referred to as the PSA, the purchase and

14     sale agreement; and the other is called the INI, the insurance

15     and indemnity agreement.  Those are the two contracts that are

16     at issue in this case, and both sides have briefed about those.

17             The PSA provides that in the event there is a breach

18     of a representation or warranty about a mortgage loan that

19     materially and adversary impacts the interests of the insurer,

20     and that is AMBAC, the plaintiff in this case, then they may

21     seek to give notice to Capital One to repurchase the loan, and

22     if in fact there is a breach that materially and adversely

23     impacts the interests of the insurer, then Capital One is

24     obligated to repurchase that loan.

25             And it further says that is the sole remedy for

D37namba                        Argument

1    breaches of reps and warranties about those loans.  And that is

2    what this case is about.  So there are some attempts, I think,

3    to end run that sole remedy provision, and AMBAC is seeking

4    general contract damages separate from the sole remedy that is

5    provided for in the contracts.

6              So why do they believe that's OK?

7              Number one, they say and allege that there are

8    pervasive breaches of the reps and warranties in these loans

9    that are in the six trusts that are at issue in this case.

10             The way they get there is they say they hired a

11   third-party reunderwriter to take a fresh look at the loan

12   files to determine whether there are breaches.  The important

13   thing to understand, your Honor, is this happened after the

14   greatest financial crisis since the Great Depression.  And

15   there were massive defaults in mortgages because unemployment

16   spiked over 10 percent, the value of homes crashed.  People

17   walked away from loans, walked away from their homes because

18   they owed more than the house was worth or they lost their job,

19   and that happened by the millions.

20             So we saw throughout this economy unprecedented

21   defaults.  So AMBAC had provided an insurance policy that

22   guaranteed the payment of principal and interest to the

23   investors in the trusts.  And because loans in the trust

24   experienced this increased unexpected level of defaults, they

25   were called upon to make good on their insurance.

1          Now, they haven't.  They have not paid on their

2     insurance anything.  The reason is AMBAC went into what is

3     called rehabilitation in the state of Wisconsin, and so the

4     insurance commissioner of the state of Wisconsin has taken over

5     AMBAC, and I'm not using the technical terms.

6          THE COURT:  No, of course.

7          MR. MURPHY:  But they are running the show now, and so

8     one of the things that happened is they got an order saying

9     they don't have to make any other payments on the policies.  I

10    feel like Marco Rubio.

11         So they are seeking damages, but they have none.  That

12    is really beside the point.  The sole remedy, to get back to

13    the sole remedy --

14         THE COURT:  When you say they have none, you mean they

15    haven't paid anything yet?

16         MR. MURPHY:  That's correct.

17         THE COURT:  It is premature?

18         MR. MURPHY:  That is true.  It is.

19         But, in any event, their argument is they're

20    pervasive.  And they use this company to say, Here, we've got

21    this tremendous exposure on our insurance policy, figure out

22    some way to come up with breaches so we can try to start

23    putting back loans to Capital One.

24         That's what I believe happened.  But, in any event,

25    so, they say it's pervasive.  It's all over these loans.  It is

1    not just --

2              THE COURT:  What proportion of the loans turned out to

3    be bad loans?

4              MR. MURPHY:  Well, your Honor, I am not exactly sure

5    what you mean by bad loans.  If you think about it --

6              THE COURT:  Where the homeowner was unable to pay the

7    mortgage is what I mean.

8              MR. MURPHY:  Because they had, let's say an 800 FICO

9    score, took out a loan, and had a great job paying a lot of

10   money and --

11             THE COURT:  I understand.  But that is not my

12   question.  My question is how many people did that happen to?

13             MR. MURPHY:  -- and three years later they lost their

14   job and could no longer pay the loan, is that a bad loan?

15   Actually, it is a good loan.  And it is an unfortunate thing

16   that has happened to people in our country that they found

17   themselves in that position.

18             THE COURT:  I am not quibbling over words.  Which of

19   the loans were unable to be repaid?

20             MR. MURPHY:  They have a chart in the complaint --

21             THE COURT:  What proportion of those?

22             MR. MURPHY:  -- which shows different.

23             THE COURT:  I understand.  But why don't you give me

24   an idea.

25             MR. MURPHY:  I think it ranges, my recollection is it

D37namba                          Argument

1    ranges from 18 to somewhere in the mid 30 percentage.  And

2    these loans were adjustable rate mortgages.  They were called

3    option ARMs.

4                THE COURT:  The bank was not giving the mortgages?

5                MR. MURPHY:  Yes.

6                THE COURT:  Oh, it was.

7                MR. MURPHY:  Yes.

8                THE COURT:  Have they adjusted the mortgages?

9                MR. MURPHY:  The rates adjust according to the terms

10   of the loans, which change from time to time.  These

11   underwriting guidelines are not static, but, yes, the loans

12   adjust.  They are adjustable rate mortgages.  And those

13   mortgages were more susceptible to defaults across the industry

14   than some other types of mortgages, but this was fully

15   disclosed obviously to the investors, the nature of the loans

16   that were being made.

17               But anyway their argument is there are pervasive

18   breaches, and therefore they are no longer obligated to follow

19   what the contract says.  The contract says their sole remedy

20   for breaches that materially and --

21               THE COURT:  Why don't you read me that sentence.

22               MR. MURPHY:  Your Honor, the repurchase protocol

23   starts at page 60 of the purchase and sale agreement.  That is

24   in the Court's file appended to the declaration of Cameron

25   Matheson that was filed on February 6, 2013.  It is Exhibit A.

D37namba                        Argument

1              THE COURT:  Was that part of the motion to dismiss on

2     the face of the complaint?

3              MR. MURPHY:  Yes.

4              THE COURT:  Is that incorporated by reference into the

5     complaint?

6              MR. MURPHY:  It is.  It absolutely is.

7              THE COURT:  All of these affidavits are incorporated

8     by reference?

9              MR. MURPHY:  The declarations attached documents that

10    were only documents that were specifically referenced in the

11    complaint.

12             THE COURT:  All right.

13             MR. MURPHY:  So the repurchase protocol itself covers

14    about two pages.  That's page 60 -- page 62 of this Exhibit A

15    to Mr. Matheson's declaration.  If you go to page 62, it is

16    2.04(b)(i) and it says that "It is understood and agreed that

17    the obligation under this agreement of seller or the servicer

18    to purchase or substitute any mortgage loan pursuant to Section

19    2.01, 2.02 or 2.04(b) shall constitute the sole and exclusive

20    remedy respecting a breach of the provision of Sections 2.01 or

21    2.02," etc., etc.

22             What I would say, your Honor, is I don't believe that

23    we have a dispute actually with AMBAC with respect to Count One

24    of their complaint, which seeks repurchase of loans and that

25    under that count they are bound by the sole remedy.  They can

D37namba                      Argument

1    speak for themselves, but that is my interpretation of their

2    filing.

3          THE COURT:  That is not their only claim.

4          MR. MURPHY:  It is the other claims that they attempt

5    to do an end run on this sole remedy provision.  The important

6    thing about the language is it does not say this sole remedy

7    applies unless there are a lot of them, unless there are a lot

8    of repurchases.  They could have said that.  They could have

9    said a number of things.  They didn't say that.  They said if

10   you want to enforce these reps and warranties you must follow

11   this repurchase protocol, and they have to an extent with

12   respect to 1286 loans.  They haven't with respect to the rest.

13         So my first point is there is no exception for

14   pervasive or there is a whole bunch of them.

15         THE COURT:  Where does the expression pervasive come

16   from?

17         MR. MURPHY:  Simply from the complaint.  That is their

18   characterization of their findings.

19         My second point is simply that these documents, as the

20   Court has already said, there was a whole lot of securitization

21   activity going on, particularly in this time period we are

22   talking about, which was 2006 and 2007, so it is a lot of

23   securitization going on on Wall Street of mortgage loans.  So

24   what happened is there developed pretty much a standard set of

25   documentation for these deals.

1          So what we have here is fairly standard language

2     across many, many deals.  In particular it is standard language

3     in the case Judge Rakoff decided last month, which is <u>Assured</u>

4     <u>v. Flagstar</u>.  Assured is a monoline financial guarantor, just

5     like AMBAC, in exactly the same business, and they insured a

6     deal.  Flagstar was the originator of the loans in that deal,

7     and they had the same documentation.  They had this purchase

8     and sale agreement and they had the insurance and indemnity

9     agreement.  And Assured made exactly the same arguments that

10    AMBAC is making today on a motion to dismiss.  Flagstar brought

11    a motion to dismiss saying, your Honor, here at the outset of

12    the case it's important that we establish that it is the sole

13    remedy for what they are seeking.

14         And what they were seeking is the same.  They sought

15    indemnification, they sought reimbursement and all of that, and

16    Judge Rakoff looked at both agreements, with virtually

17    identical language, and determined that Assured could not

18    pursue these other claims because they had agreed to the sole

19    remedy.

20         So he rejected --

21         THE COURT:  What is the sole remedy under your

22    interpretation?

23         MR. MURPHY:  Repurchase of loans.

24         So he rejected an indemnification claim, he rejected a

25    reimbursement claim, and those are Count Four and Count Five in

D37namba                        Argument

1    this complaint.  It's the same.  The analysis is the same.  So,

2    while this court certainly is not bound by Judge Rakoff, what I

3    would simply say is Judge Rakoff has explained the analysis far

4    better than I can do standing up today, and I would simply ask,

5    we have dumped a lot of paper on the Court and I apologize for

6    that, but if the Court could read a few cases --

7              THE COURT:  Of course.  I read everything you cite.

8              MR. MURPHY:  I would put this at the very top.  That

9    is the decision on the motion to dismiss which was --

10             THE COURT:  All right.  Thank you.  I will hear now

11   from the other side.

12             MR. MURPHY:  Your Honor, there was a second issue

13   about whether all of the loans are at issue in this case or

14   simply the ones for which they have given notice.  Would you

15   like me to address that one as well?

16             THE COURT:  I will come back to you.

17             MR. MURPHY:  OK.

18             MR. TOMLINSON:  Good morning, your Honor.  Peter

19   Tomlin son from Patterson Belknap, and I represent both of the

20   plaintiffs in this case AMBAC Assurance Corporation and the

21   Segregated Account.

22             THE COURT:  All right.  Is it your position that this

23   is an ambiguous contract?

24             MR. TOMLINSON:  No, your Honor.  I think it's actually

25   quite clear.  Mr. Murphy glosses over what AMBAC's claim is.

D37namba                           Argument

1   He spent a substantial amount of time talking about the pooling

2   and servicing agreement.  He's right, that we don't disagree

3   that in the pooling and servicing agreement there are specific

4   loan-level representations that are about the individual

5   mortgage loans.  These are important representations that say

6   that Chevy Chase Bank originated the loans in accordance with

7   the underwriting guidelines, that there was no fraud committed

8   in connection with the origination of these mortgage loans.

9   These are specific loan-by-loan representations.  In our

10  complaint we call them the loan-level representations.

11          For breach of the loan-level representations, he read

12  you what the parties referred to as the repurchase protocol.

13  So if you have, you know, we have 12,000 loans here in six

14  transactions, and if you have loans that don't comply with the

15  specific representations, there is a repurchase protocol.

16  Mr. Murphy read you the language.  He glossed over the very

17  statement about what the sole remedy -- I don't know if you

18  still have it in front of you, page 62 of the PSA.

19          THE COURT:  Just a moment.

20          MR. TOMLINSON:  (i).

21          THE COURT:  Yes.  I have it in front of me.

22          MR. TOMLINSON:  "It is understood and agreed that the

23  obligations under this agreement of the seller or servicer,"

24  which is Chevy Chase Bank, now known as Capital One, "to

25  purchase or substitute any mortgage loan pursuant to Sections

D37namba                    Argument

1   2.01, 2.02 or 2.04(b) shall constitute the sole and exclusive

2   remedy respecting a breach of the provisions of Section 2.01 or

3   2.02 or the representations and warranties set forth in Section

4   2.03 and 2.04."

5          Our complaint contains other breaches, contained

6   allegations of breaches of very important representations that

7   AMBAC obtained in a separate agreement, which is the insurance

8   and indemnity agreement, which is Exhibit B to the Matheson

9   affirmation.

10          I don't know if it would be helpful, your Honor.  I

11   have a little one page document that has the provisions I am

12   talking about.  You can also follow along in there, but if you

13   want, I'm happy to hand this up.

14          THE COURT:  Very well.

15          MR. TOMLINSON:  I have one for Mr. Murphy and

16   Mr. Goldfarb, too.

17          THE COURT:  I think I have something similar, but I

18   will take yours.

19          MR. TOMLINSON:  So in connection with the transaction,

20   Mr. Murphy gave you a little background on AMBAC's role in the

21   transaction.

22          While I was interested to hear that Chevy Chase dates

23   back to the 19th century, I don't really think that has much to

24   do with anything on this motion to dismiss, and we have alleged

25   in our complaint basically a wholesale abandonment of mortgage

D37namba                         Argument

1      underwriting in the 12,000 loans in these six transactions that

2      have performed horribly.  The transactions are going to suffer

3      hundreds of millions of dollars in losses.

4             Chevy Chase Bank made very detailed representations

5      both about the specific loans in the transaction and also about

6      its practices to AMBAC.  What the events of the last few years

7      have shown is not there was a financial crisis that caused a

8      lot of people to default on the mortgages, obviously there was

9      a financial crisis, but what has come to light is that banks

10     like Chevy Chase Bank, maybe they were prudent underwriters in

11     the late 1800s, but in the 2005, 2006, 2007 era the speed at

12     which they underwrote mortgages, issued mortgages to make

13     profits doing securitizations, we see a wholesale abandonment

14     of mortgage underwriting.

15            That's what our complaint is about, the losses.  He

16     did refer to a chart in our complaint.  If you actually look

17     at, I think it is on page 26 of our complaint, there is a chart

18     of the default rates.  These numbers may be a little outdated

19     because they were at the time we filed the complaint, but in

20     one of the transactions over 35 percent of the loans in this

21     transaction were severely delinquent, liquidated or in

22     foreclosure.  So that is a huge percentage.

23            THE COURT:  Unfortunately, that was all over the

24     place.

25            MR. TOMLINSON:  Yes.

D37namba                          Argument

1              Now Mr. Murphy makes the point that, oh, well Chevy

2       Chase Bank is better than the others.  Again, on a motion to

3       dismiss I don't real --

4              THE COURT:  That's not the point.  Right.

5              MR. TOMLINSON:  That is not our point.  We are only

6       suing them for hundreds of millions of dollars, not billions of

7       dollars, maybe because their loans aren't as bad as the others.

8       It is like a child saying, oh, I am not as bad as some other

9       kids.  I don't think that is relevant on this motion to

10      dismiss, but I don't want to digress any further.  I want to go

11      back to AMBAC's contract claims.

12             In the handout that I gave you, there is on the first

13      page we have put what we called the transaction-level

14      representations.

15             THE COURT:  Just one moment.

16             Which document are you asking me to look at?

17             MR. TOMLINSON:  The one I handed up.  It says "Chevy

18      Chase 2007-1" on the top.

19             THE COURT:  Yes.

20             MR. TOMLINSON:  What we have excerpted on the first

21      page, and these are just excerpts from the documents attached

22      to Mr. Matheson's affidavit, are from the insurance and

23      indemnity agreement.  In connection with this transaction, and

24      I think both parties are using 2007-1 as the example, the

25      relevant --

1        THE COURT:  Aren't you suing for repurchase?

2        MR. TOMLINSON:  We are suing for repurchase, and we

3   are also suing for breach of the insurance and indemnity

4   agreement.  And the insurance and indemnity agreement was an

5   agreement between AMBAC and Capital One.  Whereas AMBAC is not

6   actually a party to the PSA that Mr. Murphy referred to, we are

7   a third-party beneficiary, and we certainly have the rights

8   under the PSA.  But my client got important substantive rights

9   in the insurance and indemnity agreement, and they got

10  representations.  We call these the transaction-level

11  representations; because these don't relate to the individual

12  one-off loans, these relate to the transaction as a whole.

13        These are in an agreement signed by Capital One in

14  which they make, some of the representations are here.  For

15  instance, under 2.01(k), the private placement memorandum does

16  not contain any untrue statement of material fact.  It does not

17  omit to state a material fact necessary to make the statements

18  made therein in light of the circumstances under which they

19  were made not misleading.

20        Each deal has a private placement memorandum.  And the

21  private placement memorandum -- and we allege this in our

22  complaint I think at paragraph 38 -- contains statements about

23  Chevy Chase's mortgage practices.  For instance, it says the

24  loans in the transaction were originated generally in

25  accordance with Chevy Chase's underwriting guidelines.

1         These are important points for AMBAC.  AMBAC is taking

2    on the risk of insuring the cash flows from six residential

3    mortgage-backed securities transactions.  Yes, they have the

4    right to put loans back, to demand repurchase of loans that

5    don't comply.  I think Judge Crotty used the phrase, that is

6    good for onesies and twosies.

7         AMBAC has that right.  They don't dispute that AMBAC

8    that is that right.  They say that is all AMBAC can do.  They

9    try and shoehorn all of AMBAC's contract claims into the

10   loan-level representations.

11        But the fact is AMBAC got different representations

12   that were substantive and important to AMBAC, and the paragraph

13   from the INI at the bottom, 3.01(i), actually makes clear that

14   these representations that we call the transaction-level

15   representations were actually a condition precedent to AMBAC

16   issuing the policy.

17        So AMBAC issued the policy on the condition that these

18   representations and warranties were true.  So we got a

19   representation that the information in the private placement

20   memorandum contains a detailed discussion of how they originate

21   mortgages.

22        There is also an accuracy-of-information

23   representation.  They provided us a lot of information about

24   the mortgages, and they represented in that representation that

25   that information is materially accurate.

1            Yet we see systemic, as we have alleged in our

2     complaint, a wholesale abandonment of underwriting guidelines,

3     systemic problems with Chevy Chase's mortgage underwriting.  So

4     those we allege in our complaint are breaches of the

5     transaction-level representations.

6            So the issue on the motion, your Honor, is whether

7     that claim for breach of those representations is limited to

8     the repurchase protocol, which is in a different agreement,

9     which is in the PSA.

10            If you turn to the next page of my handout, simply at

11     the top we have just recopied the sole remedy provision from

12     the PSA.  There you see it's very specifically the language in

13     there says that it is the sole and exclusive remedy respecting

14     a breach of provisions of Section 2.01 or 2.02 or of the

15     representations.

16            THE COURT:  2.03 and 2.04?

17            MR. TOMLINSON:  Yes.  And those are the loan-level

18     representations in the PSA.  Those are not the

19     transaction-level representations that form the basis of our

20     breach of the material breach of the insurance indemnity

21     agreement.  I mean, it would have been very easy if the parties

22     had wanted to limit AMBAC's remedy for the breach of the INI

23     provisions to the PSA repurchase protocol to just say so.  It

24     doesn't say that.

25            The sole remedy provision from the PSA is actually

1  repeated in the insurance and indemnity agreement.  That's

2  where I have 2.01(l), right underneath it.

3          So here we are now in the insurance and indemnity

4  agreement, and it repeats the sole remedy provision.  But,

5  again, it says the remedy for any breach of any representation

6  and warranty of Chevy Chase in Section 2.04 of the pooling and

7  servicing agreement.  It doesn't say for any breach of a

8  representation and warranty about a loan or any breach of any

9  representation in the insurance and indemnity agreement.

10          It doesn't say that.  It could have said that.  But it

11  very clearly limits AMBAC's remedies for breach of Section

12  2.04.  And our claim for material breach of contract is not

13  based on Section 2.04 of the PSA, and this sole remedy does not

14  apply.

15          Mr. Murphy talked at length about the <u>Flagstar</u>

16  decision by Judge Rakoff.  That is actually an important

17  decision on various points in the motion today.  It is true

18  that Judge Rakoff did hold that Assured's sole remedy was the

19  loan-by-loan repurchase.  But Assured in that case did not make

20  this argument about the transaction-level representations and

21  warranties, and based on my review of the complaint they didn't

22  even allege that claim.

23          So our position is that decision is not on point.  It

24  does not involve allegations of breaches of representations and

25  warranties in a separate contract.  Taken to its extreme,

D37namba                          Argument

Capital One's argument, we get these important representations
in the insurance and indemnity agreement but we don't have any
remedy for them, we already had the loan-by-loan repurchase
remedy in the PSA.  We went ahead and issued the policy as a
result of getting the insurance and indemnity agreement.  And
now he says, Oh, by the way, your remedy for that is only the
loan-by-loan repurchase protocol.

          The kicker is that we have put back nearly 1,300 loans
through the repurchase protocol.  They haven't bought back a
single one.  And in their letters responding to us they
actually said what we are saying.  They said, Oh, the
loan-by-loan repurchase protocol is not intended for bulk
repurchase demands.  You put back too many.  It was never
intended for this.

          Frankly, that is something else we agree on, that the
loan-by-loan repurchase protocol, as Judge Crotty said, for
onesies and twosies, if you have a few loans that don't comply,
you can use that.

          What we have here are six lemons.  The whole deal is a
lemon, thousands and thousands of breaching loans.  Our breach
rate is nearly 87 percent.  We had a statistician take 400
loans, statistically select 400 loans from each transaction,
and I think 87 percent on average between all six transactions
breached the representations and warranties.

          We used the repurchase protocol, and they didn't buy a

1    single one.  And here they are today telling your Honor that is

2    our only remedy.

3            That is all I have, your Honor, on the sole remedy,

4    unless you have any specific questions.

5            THE COURT:  No.

6            What else do you want to talk to me about besides sole

7    remedy.  Let's put that aside.

8            MR. MURPHY:  Could I take two minutes to respond to

9    what was said there.

10           We have never agreed that they are relieved of the

11   sole remedy, the repurchase protocol.  They waited years after

12   these deals were done to submit all of these repurchase

13   demands, and what we received, your Honor, and this is in the

14   record, they referenced letters.

15           THE COURT:  Is this alleged in the complaint?

16           MR. MURPHY:  Yes.  They referenced letters.

17           THE COURT:  Why don't you read me from the complaint

18   what it says.  That is what happens with prolix complaints.

19   They read like novels instead of complaints.

20           MR. MURPHY:  Your Honor, there is a reference to the

21   back and forth about this repurchase protocol.  Mr. Tomlinson

22   referenced the response.  We put in the response.  It is in the

23   complaint.  I will give you the citation to where they quote,

24   they cite having received the responses.

25           We put in the letter so you could see it, because this

D37namba                      Argument

1   is my concern, is that --

2              THE COURT:  What do you mean you put in the letter?

3              MR. MURPHY:  We put --

4              THE COURT:  The letter is not on the face of the

5   complaint.

6              MR. MURPHY:  They referenced that they received the

7   letter and that we did not repurchase a loan.

8              THE COURT:  Their allegation is that you didn't

9   repurchase, right?

10             MR. MURPHY:  Right.  Exactly.

11             THE COURT:  You don't need the letter for repurchase.

12             MR. MURPHY:  We thought it was appropriate to put in

13  the letter, since it is specifically relied upon in the

14  complaint.

15             THE COURT:  Well, you have an awful lot of stuff here.

16             MR. MURPHY:  We do.  It is attached to the second

17  Cameron Matheson affidavit submitted in connection --

18             THE COURT:  We don't usually get so many affidavits on

19  complaints.  That's because we have such prolix complaints.

20             MR. MURPHY:  Some of the complaints that have been

21  filed in cases actually attach all this documentation.  This

22  one did not.

23             THE COURT:  I know they do.  It is a real question as

24  to whether they are appropriate.

25             MR. MURPHY:  The letters, your Honor, give the Court a

D37namba                        Argument

1    flavor for what we are dealing with here.

2                THE COURT:  I understand.  But a complaint should

3    state a claim, not give a flavor.

4                MR. MURPHY:  The letters, your Honor, these pervasive

5    breaches, the letters show you what we are actually talking

6    about here.  One of the loans the criticism is that the

7    borrower took out $3,000 at closing and the guidelines only

8    permitted $2,000.

9                THE COURT:  Why did they permit the $3,000?

10               MR. MURPHY:  Their math was wrong.  It is explained in

11   the letter.  They took out $1700.

12               THE COURT:  I see.  So a mistake was made on some

13   loan.

14               MR. MURPHY:  Another one, we are missing the HUD-1

15   statement.  The loan can't close without a HUD-1 statement.

16               THE COURT:  What is the significance of that?

17               MR. MURPHY:  I am just -- they referenced the letters.

18   The letters show that what really happened is pervasive demands

19   for repurchase that have absolutely no basis whatsoever.

20               The other thing that happened in the letters is we

21   asked for information to support the repurchase demand and they

22   did not provide it.

23               We further asked let's have a meeting to sit down and

24   talk about your position on these loans and our position on

25   these loans and resolve it.  That's why there's this repurchase

D37namba                    Argument

1   protocol.  Because one thing the lawyers --

2            THE COURT:  Why don't you do that now.  Why don't you

3   sit down together and work something out?

4            MR. MURPHY:  I think it's a great idea.  This is the

5   thing that the lawyers did right, your Honor.  They said, let's

6   not run to Court about repurchase demands.  Let's have this

7   protocol where there's some back and forth and some time and

8   this condition precedent that you do this before you run to

9   Court.  So we did our part, even though we've got some of the

10  most astounding demands I've ever seen.  Like, for instance, --

11           THE COURT:  Well, the more we get into all of this

12  nitty gritty --

13           MR. MURPHY:  There are hundreds of them.

14           THE COURT:  -- the less obvious anything is on the

15  face of the complaint.

16           MR. MURPHY:  There are hundreds of them.  Hundreds.

17  That is why we didn't buy back the loans.

18           The second issue is what are the loans at issue in

19  this case.

20           By the way, all of the arguments articulated about

21  sole remedy issue were very, very well stated.  AMBAC's

22  position is very well stated.  These are actually the arguments

23  Judge Rakoff dealt with.  He dealt with that agreement.

24           THE COURT:  I am aware that you consider Judge

25  Rakoff's opinion something I should follow.

 1          MR. MURPHY:  OK.

 2          The second issue is what are the loans at issue in

 3   this case.  Are they the loans for which they actually gave

 4   some notice, or is it the vast unknown of thousands of other

 5   loans?  That issue was specifically addressed in a federal

 6   case --

 7          THE COURT:  Are you telling me that the complaint

 8   lacks specificity?  Is that what you are saying?

 9          MR. MURPHY:  No, your Honor.  I am saying that it is a

10   condition precedent to suing Capital One that you follow this

11   repurchase protocol, which begins with a notice of here are the

12   loans we believe have breached and here's why.  They didn't do

13   that except for 1286 loans.

14          Just so I'm clear, we are not seeking to dismiss this

15   entire case.  We understand that there are 1286 loans at issue.

16          They disagree.  They say that now all of the loans are

17   at issue because they follow the protocol with respect to 1286.

18          The contract doesn't say that.  The contract creates

19   no exception for following the protocol.  And so there is a

20   developing area of the law.

21          THE COURT:  So you are saying that the complaint seeks

22   more than the plaintiff is entitled to.  But how about the part

23   that is sought that you think is appropriate?

24          MR. MURPHY:  What I think is appropriate, we are not

25   moving to dismiss Count One with respect to 1286 loans for

D37namba                          Argument

which they have given notice.  We are not moving to dismiss

that.  We are moving to dismiss the other counts and the

concept of including an unknown thousand number of loans for

which we were not given notice.  This precise issue was

addressed last year in the federal court in Minnesota in a case

called <u>Master Asset Backed Services v. WMC</u>, 843 F.Supp.2d 996.

          And there, exactly the same situation.  The plaintiff

gave notice about 150 loans.  They did a sample.  They've done

a sample.  Plaintiff there did a sample of 200 loans, and they

demanded repurchase of 150 of them, and they took the position

that now all of the loans are at issue.

          I said before that the transaction documents are

pretty standard.  What the Court will see in reading that case

is we are talking about pretty much actually the same

documents.  There it said the sole remedy of repurchase, and

there is this repurchase protocol.

          The judge said, Plaintiff, you have given notice of

150 loans only.  This case is going to be about those 150 loans

and all of your other claims related to other loans in the deal

are dismissed.

          It wasn't summary judgment, it wasn't trial, it was a

motion to dismiss.  The Court determined this is going to be a

case about those loans where you followed the protocol.  And

that case, we submit, was properly decided on documentation.

          THE COURT:  That is a different issue.

1          MR. MURPHY:  It is.  That is the second issue.

2          THE COURT:  You are now arguing that under the

3    contract they were required to give you notice of which loans

4    they wanted repurchase of?

5          MR. MURPHY:  Right.

6          THE COURT:  And they have failed to do that?

7          MR. MURPHY:  That is correct.

8          THE COURT:  And therefore are not entitled to

9    repurchase?

10         MR. MURPHY:  That's right.  Until such time as they

11   have given notice.

12         THE COURT:  Let me hear your adversary on that.

13         Why is that not a basis for dismissal?

14         MR. TOMLINSON:  First, your Honor, this is only

15   relevant to the loan repurchase claim.

16         THE COURT:  Let's stay for a moment with the loan

17   repurchase claim.

18         MR. TOMLINSON:  The short answer is, your Honor, we

19   have alleged that Capital One is on constructive inquiry notice

20   of the widespread and wholesale breaches in the six pools, and

21   we do that in the complaint.

22         THE COURT:  What does the contract say about notice?

23         MR. TOMLINSON:  We do that at paragraph 45, your

24   Honor, of our complaint.

25         The contract, the PSA on notice says that upon

D37namba                        Argument

 1    discovery by Chevy Chase and various, and us, or the trustee,

 2    they are supposed to give prompt notice to the other parties.

 3    Chevy Chase here --

 4            THE COURT:  So it is your position that was not your

 5    sole obligation?

 6            MR. TOMLINSON:  Yes.

 7            THE COURT:  Or you alone were not obliged; that the

 8    defendant made the same mistake?

 9            MR. TOMLINSON:  The defendant originated these loans,

10    they serviced these loans.  They are much closer to these loans

11    than we are.

12            They have the loan files.  They know what they did

13    with their loan practices in 2006 and 2007.  The fact that we

14    put back 1,300 loans from six transactions puts them on

15    constructive notice that there are widespread deficiencies in

16    this pool.

17            There is a case that is directly on point, and it is

18    actually Mr. Murphy's favorite case, which he didn't mention

19    here.  It is Assured v. Flagstar.  Judge Rakoff considered,

20    after finding that Assured's sole remedy was the loan put-back,

21    Flagstar said, well, it can only be the loans that have been

22    put back.  Judge Rakoff specifically rejected that and said,

23    "The material uniformity of the underlying loan population" --

24    let me just cut to the chase.  "Notification to Flagstar of

25    pervasive breaches affecting charged-off loans that were the

1   subjects of Assured's internal review render Flagstar

2   constructively aware or at a minimum put Flagstar on inquiry

3   notice of substantial likelihood that these breaches extended

4   beyond the charged-off loan population."

5          Judge Rakoff then allowed Assured to do sampling.

6   Mr. Murphy's approach is we are going to have to do this

7   loan-by-loan, death by a thousand cuts.  We have done 1,286,

8   and they haven't repurchased a single one.

9          Also, given the approach that Capital One has taken

10  it's also a futile remedy.  So we have given notice with

11  respect to 1286, and we have alleged in our complaint that they

12  are on constructive notice that these six pools are replete

13  with nonconforming loans, and under Assured v. Flagstar that is

14  sufficient at this stage of the case.

15         MR. MURPHY:  Very, very briefly, your Honor.

16         Our motion in the Flagstar case disposes of counts

17  Three and Four and Five.  I haven't spoken about Count Two,

18  which is they allege a breach of the repurchase protocol, which

19  is a remedy.

20         They allege there is a breach of the remedy because we

21  haven't bought back loans, and therefore they can sue for

22  damages.  That remedy is for repurchase, whether the seller has

23  repurchased the loans or not.  It's a remedy.  It is not an

24  independent basis for a claim.

25         They have cited three cases, not in New York, to

support the idea that they can somehow sue on the remedy and

convert the sole remedy of repurchase into a damages case.  I

am not articulating it well only because it doesn't make any

sense.

They cite three cases.  One is <u>La Salle Bank</u>, district

of Maryland -- no New York cases here -- and this says, the

district court case says, "Under New York law a loan seller's

failure to repurchase nonconforming loans upon demand is an

independent breach."

That's their position, and that's what they rely on.

In their brief they cite that case.  There's no New

York cases cited in that District of Maryland case.

THE COURT:  I understand, but that District of

Maryland case was under New York law.

MR. MURPHY:  It wasn't.

THE COURT:  I see.  Then how is it that New York law

was recited?

MR. MURPHY:  It is a fascinating story.  In their

brief where they cited that language, which is pretty absolute

in supporting their position, there's parens "citation

omitted."  There is a citation in there.  And it is a citation

to a First Circuit case called <u>Resolution Trust</u>, a First

Circuit case.

THE COURT:  They were not applying New York law either

in the First Circuit?

1          MR. MURPHY:  The First Circuit said, whether or not

2     he, the defendant, committed an independent breach by failing

3     to repurchase on demand, the district court was free to make

4     the purchaser whole, and it did so in terms of the obligations

5     imposed by the contract.

6          The First Circuit said whether or not there is an

7     independent breach here.  The District of Maryland cited that

8     case, and to me it is an example of why it's really important

9     to hire really good clerks.  Because they converted that First

10    Circuit decision into --

11         THE COURT:  Never mind really good clerks.  You are

12    suggesting the judge doesn't read the opinions.

13         MR. MURPHY:  All I know is what it says in the

14    complaint.

15         Under New York law a loan seller's failure to

16    repurchase nonperforming loans upon demand is an independent

17    breach.  We cite Resolution Trust, First Circuit, and that case

18    doesn't say that and New York law has never said that.  There's

19    no New York Court of Appeals case cited by anybody, there is no

20    Second Circuit case, it is wrong.  It is a remedy to say that

21    there is a breach of the repurchase remedy, and when that

22    happens, I am relieved of the sole remedy that we agreed to of

23    repurchase.  That's gone, and now I can sue for damages.  It

24    doesn't make any sense, and that's why there's no authority to

25    support that idea.

1          MR. TOMLINSON:  I will be brief, your Honor.

2          Our position is it is very clear that the contract has

3    an independent covenant that says in the event that there is a

4    loan that doesn't comply with the loan-level representations

5    and warranties, Capital One is obligated to repurchase that

6    loan if it materially and adversely affects the interest of the

7    insured.

8          That is a term in the contract.  That is a covenant in

9    the contract.  We allege that they have breached it.  We have a

10   breach of contract for breach of the repurchase protocol.

11         I think the Arkansas case from 2012 the Eastern

12   District of Arkansas case involving Lehman, which I had a

13   chance to look at very briefly, very clearly is applying New

14   York law and holds exactly that.

15         I haven't had a chance to reread the <u>Resolution Trust</u>

16   case after Mr. Murphy's point, but I think it is as simple as

17   that.  It is a separate covenant in the contract.  We have

18   alleged a breach of it, and that is a separate breach of

19   contract claim.  He says there is no New York Court of Appeals

20   authority on point supporting our position, but he really

21   doesn't rely on anything.

22         Your Honor, I won't go into the reimbursement and

23   indemnification claims.  There are separate claims.  Our

24   position is they are not governed by the sole remedy.  I think

25   our position is set forth in the briefs, but he mentioned them

1     briefly so I just wanted to refer your Honor to the brief.

2               THE COURT:  I take it that your position is that the

3     provision on sole remedy doesn't apply to a lot of this?

4               MR. TOMLINSON:  Yes.  It applies to what it says it

5     applies to:  Breaches of Section 2.04 of the PSA.  It is the

6     sole remedy for that.

7               There is a whole section of the INI called

8     reimbursement claim, so why would there be a section of the

9     insurance indemnity agreement called AMBAC's reimbursement

10    right if AMBAC's only remedy was the loan-by-loan repurchase.

11              Judge Rakoff in <u>Flagstar</u> actually awarded Assured

12    reimbursement of its attorney's fees under the reimbursement,

13    even though he had found that the sole remedy for the loan

14    put-backs was the repurchase protocol.

15              We actually have two bases for our reimbursement

16    claim.  We have one, the legal fees for this action in putting

17    back all the loans, and there is a separate prong of the

18    reimbursement provision here that actually provides that AMBAC

19    can get its claims payments back for failure of Capital One to

20    remove loans from the transactions.  I think that is all set

21    forth in our paper, but that is a separate claim that AMBAC is

22    entitled to under the clear language of the INI.

23              THE COURT:  And both sides here want to argue that

24    this is an unambiguous contract?

25              MR. TOMLINSON:  We think it is clear, your Honor.  It

1   is a motion to dismiss, and if your Honor decided that it is

2   not clear, we could have discovery on it.  But we think the

3   sole remedy provision is clear on its face, that it does not

4   apply to our transaction-level claims or indemnification claim

5   or our reimbursement claim.

6          MR. MURPHY:  Your Honor, with respect to the issues

7   raised on the motion, it is our position that those are not

8   ambiguous in any way and are very clear.

9          Two quick points.  He mentioned a District of Arkansas

10  case.  There is no mention of a sole remedy.  So while I said

11  documentation is standard, there is no mention in that case of

12  what we are talking about here, the sole remedy provision.

13         Secondly, all of these other remedies are dealt -- the

14  idea stems from this 5.02 of the insurance and indemnification

15  agreement.  5.02(b) starts with this provision, your Honor,

16  "Unless otherwise expressly provided, no remedy herein

17  conferred is intended to be exclusive."

18         Well, we showed you the language where it said

19  precisely --

20         THE COURT:  It doesn't say exclusive.

21         MR. MURPHY:  It does say exclusive.

22         THE COURT:  Why don't you read me the language again.

23         MR. MURPHY:  This is page 62.

24         THE COURT:  Yes.  But you have to include the sections

25  that it mentions.

D37namba                          Argument

1          MR. MURPHY:  Correct.

2          That is correct, your Honor.

3          Just so my position is clear, there are other

4    representations in the insurance and indemnity agreement that

5    provide for obligations of Chevy Chase Bank, now Capital One,

6    postclosing for instance.  Like they have the right to

7    information.  They have the right to financial information.

8    They have the right to servicing information.  They have a

9    number of rights.

10         They haven't sued on those.  Those don't have to do

11   with the loans.  The loans and claims based on the loans and

12   alleged improperly underwriting of the loans have a sole

13   remedy.

14         When they say look at the private placement

15   memorandum, it says that the loans were properly underwritten.

16   What Judge Rakoff said is, you can't end run the sole remedy by

17   saying, Hey, I've got this representation in the insurance and

18   indemnity agreement which deals with the underwriting of loans

19   and, therefore, I get to sue for damages and forget about the

20   sole remedy.

21         Judge Rakoff ruled you've got to look at these two

22   agreements together and reconcile them, and claims based on

23   there's something wrong with the loans are subject to the sole

24   remedy.

25         THE COURT:  Very commonly when you have to do so much

D37namba                          Argument

1    reconciling, the contract is not unambiguous.

2           But I understand all of the positions all of you take,

3    and I reserve decision.

4           MR. MURPHY:  Thank you, your Honor.

5           MR. TOMLINSON:  Thank you, your Honor.

6           THE COURT:  You are all excused.

7           (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25